[Cite as *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96026**

## THE STATE OF OHIO,

APPELLEE,

v.

## WARMUS,

APPELLANT.

### JUDGMENT:
### AFFIRMED IN PART, REVERSED
### IN PART, AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-536383

**BEFORE:**   Stewart, P.J., Cooney, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   November 10, 2011

ATTORNEYS:

William D. Mason, Cuyahoga County Prosecuting Attorney, and Lauren Bell, Aaron Brockler, and Daniel A. Cleary, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and Robert A. Dixon, for appellant.

MELODY J. STEWART, Presiding Judge.

{¶ 1}  A jury found defendant-appellant, Matthew Warmus, guilty of murdering a parking-lot attendant in a dispute over a parking fee, rejecting his claim that he acted in self-defense.  In this appeal, he sets forth 11 assignments of error that collectively raise issues concerning the court's admission of testimony, the jury instructions, ineffective assistance of counsel, and the imposition of a fine.

{¶ 2}  The relevant facts of this case are stated in summary form.  The state showed that Warmus and his female companion for the evening entered a downtown Cleveland parking lot that advertised $10 parking.  Warmus parked in a space next to the lot entrance, but the victim-attendant, David Williams, told him that he had parked in a $20 parking space.  Believing he was being cheated, Warmus began to argue with Williams.  The argument escalated, and Warmus pushed Williams.  Williams pushed back, and the two men grappled until Williams put Warmus in a headlock and punched him three times.  During this struggle, the attendant told Warmus's companion to "calm your boy down."  The companion told Williams that they would leave, so he released Warmus and went to assist other drivers who had entered the lot.  Warmus went to the trunk of his car and retrieved a handgun.  He pointed the gun at Williams and told him to get on the ground.  Williams began reaching for his own gun when Warmus fired three shots from a range of no more than three feet:  one shot struck Williams in the back of the head; the other two struck him in the abdomen.

**{¶ 3}** Warmus claimed to have acted in self-defense. He said that Williams's headlock caused him to lose his breath. Once released from the hold, he said that he struggled to regain his breath and heard Williams tell him to leave. Warmus replied that he was going to call the police and the owner of the parking lot to complain. At that point, Williams said, "[N]o you're not," and pulled out a gun. Warmus said he walked to his car, opened the trunk, and grabbed his gun. Warmus pointed the gun at Williams and told him to drop his gun, but Williams refused. Warmus then "shot until [Williams's] gun wasn't in his hand anymore." He placed his gun back in the trunk of the car and called the police to report the shooting.

**{¶ 4}** Eyewitnesses disputed Warmus's version of events. Although all of the eyewitnesses saw Warmus shoot Williams, none of them saw Williams holding a gun, much less pointing one at Warmus (one witness saw Williams reaching for his gun as Warmus shot him). When the police arrived, Warmus said that he knew Williams from a similar interaction a month earlier when he tried to park in the same spot and was charged an additional fee, saying, "I know him. We argued over this in the past." As Warmus sat in a police cruiser following his arrest, he told an officer that after Williams released him from the headlock, he went back to selling parking spaces. And at no point in speaking with the officer, or at any other point in the investigation, did Warmus say that he acted in self-defense. The police also found it unusual that a number of witnesses approached them after the fact to report the shooting. One of them appeared to embody the views of these witnesses by saying that she did so because she "felt that if nobody was witness for [Williams], because he was wrongly shot, I thought I should stand up for him."

I

{¶ 5}   Warmus's first assignment of error is that the court abused its discretion by allowing state witnesses to offer their opinion on key elements of self-defense—primarily their opinions that Warmus was not acting reasonably in his use of force and that he could have or should have safely retreated without using force.   He complains that these opinions amounted to opinion testimony on whether he was justified in using deadly force to defend himself.   He argues that justification for deadly force was a question of fact for the jury and that the so-called expert testimony usurped this function.

A

{¶ 6}   The elements of self-defense are that "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger."   *State v. Thomas (1997),* 77 Ohio St.3d 323, 326, 673 N.E.2d 1339, citing *State v. Williford* (1990), 49 Ohio St.3d 247, 249, 551 N.E.2d 1279.

{¶ 7}   Ohio uses a subjective test to determine whether the defendant held a bona fide belief of imminent danger, death, or great bodily harm.   The defendant acts in self-defense if he "honestly believes" that death or great bodily harm is imminent and that the only means of escape from such danger is in the use of deadly force.   *State v. Sallie (1998),* 81 Ohio St.3d 673, 676, 693 N.E.2d 267, citing *State v. Koss* (1990), 49 Ohio St.3d 213, 215, 551 N.E.2d 970.

**{¶ 8}** Though the defendant bears the burden of proving self-defense by a preponderance of the evidence, *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 490 N.E.2d 893, this does not mean that the state is barred from offering evidence to rebut the assertion of the affirmative defense in its case-in-chief. The state may offer testimony on the circumstances surrounding the events leading to the use of self-defense as a means of rebutting the defendant's assertion that he honestly believed the use of deadly force was in response to an imminent threat of death or great bodily harm. The question in this appeal is whether the state's witnesses may offer their *opinion* that the circumstances did not justify the defendant's use of deadly force.

**{¶ 9}** Although some of the witnesses were current or retired law-enforcement officers, none were offered as expert witnesses. An "expert" witness is allowed to testify to matters beyond the knowledge or experience possessed by lay persons if the witness has specialized knowledge or skill and the witness's testimony is based on reliable scientific, technical, or other specialized information. See Evid.R. 702. The law-enforcement officers were offered as fact witnesses because they actually witnessed the shooting. And the conclusions they drew about Warmus's state of mind at the time were not based on any specialized knowledge or training but were, like those of the civilian witnesses who gave similar testimony, premised on their perception of events as they witnessed them.

**{¶ 10}** A witness who is not an "expert" may testify to opinions, but is "limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." See Evid.R. 701. We have interpreted Evid.R. 701 to allow a lay witness

to express opinions that "merely summarize complex factual observations, which testimony is a composite of fact and opinion." *State v. Morris* (1982), 8 Ohio App.3d 12, 16, 455 N.E.2d 1352.

{¶ 11} Importantly, a lay witness cannot testify only to a "fact in issue" but can also testify to "an ultimate issue." Evid.R. 704 states that the testimony of a witness "in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Neither Evid.R. 701 nor 704 limits the subject matter of lay-opinion testimony, so "there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others." *United States v. Rea* (C.A.2, 1992), 958 F.2d 1206, 1214-1215 (construing analogous federal rules). For example, it has been stated that "[l]ay opinion of a witness as to a person's sanity is admissible if the witness is sufficiently acquainted with the person involved and has observed his conduct" and has personal knowledge "regarding the person's unusual, abnormal or bizarre conduct." *United States v. LeRoy* (C.A.10, 1991), 944 F.2d 787, 789. See also *State v. Nicholas* (July 30, 1986), 1st Dist. No. C-850713 (when an insanity defense was raised, lay opinion of a police officer concerning the defendant's mental state was appropriate on ability to perceive and respond to the display of authority of uniformed officers at the scene).

{¶ 12} Allowing an opinion as to whether a defendant had the required state of mind when acting in self-defense is not the same thing as allowing a lay witness to express an opinion as to what the witness would have done in similar circumstances. In *State v. Johnson*, 10th Dist. No. 02AP-373, 2002-Ohio-6957, the court held that it was improper

for police officers who did not witness the crime to state that based on their training as law-enforcement officers and faced with the same facts and circumstances as presented in the case, they would not have shot another in an act of self-defense as claimed by the defendant. These statements were inadmissible as lay opinion because they were not helpful to the jury—neither police officer in *Johnson* actually witnessed the crime, so their conclusions based on the same facts as heard by the jury failed to meet the Evid.R. 701 test of aiding the trier of fact in deciding an ultimate issue. *Id.* at ¶ 36. *Johnson* held that the jury was just as capable of drawing conclusions from the evidence as were the police officers who did not actually witness the crime.

B

{¶ 13} Timothy Zvoncheck saw the altercation between Warmus and Williams as he pulled into the parking lot. He testified that 30 seconds elapsed from the time that Williams released Warmus from the headlock to when Warmus went to the trunk of his car to get the gun. When asked if "there was anything preventing the defendant from simply leaving the parking lot," Zvoncheck replied, "[N]o." The state went on to ask, "[A]fter [the victim] released the defendant from the headlock, did you believe that the defendant's life was in danger?" Over objection, Zvoncheck replied, "[N]o." Zvoncheck later reaffirmed that "I believe [Warmus] could have left the parking lot."

{¶ 14} Eric Livingstone parked his car in the parking lot and was walking to the arena when he saw the shooting. When asked by the state whether "there was anything preventing [Warmus] from simply leaving the parking lot," Livingstone answered, "[N]o." The state then asked, "[F]rom your vantage point as you were watching this happen, the

initial fight when the defendant goes to his trunk, did you think in your opinion the defendant was in any danger?" Livingstone again replied "[N]o."

{¶ 15} Demetrius Jaggers was in the passenger seat of a car that was being held up in traffic near the parking lot. He saw Warmus and Williams wrestling until Williams put Warmus in a headlock. Williams released Warmus and started to walk to the parking attendant's booth. Jaggers saw Warmus reach into his trunk and pull out the gun. As Jaggers turned to tell his wife about the gun, he heard three shots and saw Williams on the ground. Jaggers said that Williams did not attempt to prevent Warmus from walking away after releasing him from the headlock. The state then asked, "[F]rom your observations, did you believe that the defendant had a reason to fear for his life?" Jaggers answered, "[N]o."

{¶ 16} Rebecca Beall testified that she pulled into the lot and saw two men wrestling, with one holding the other in a headlock. She saw Warmus's companion grab Williams's arm and tell him that she and Warmus would leave. Williams walked to the front of Beall's car while Warmus went to the trunk of his car and pulled out a gun. Beall's 12-year-old son asked, "[I]s that guy going to shoot him?" She covered her son for protection because he was on the same side of the car as Warmus and then saw Warmus shoot Williams. She saw Williams make no aggressive movements toward Warmus after releasing him from the headlock. The state asked her, "[F]rom your vantage point in this car where you are, did this incident with Mr. Warmus going to the trunk and reapproaching and shooting [Williams], and from your vantage point, did this have to happen?" She replied, "[N]o."

{¶ 17} Stuart Shoaff, a retired agent for the Federal Bureau of Investigation, was in his car waiting in traffic near the parking lot when he saw two individuals wrestling. He recounted that Williams had Warmus in a headlock and punched Warmus with "three little quick punches" that he said "didn't look very hard to me." The two men broke apart, and he saw Warmus walk to his car and get something from his trunk, although he could not see what it was. Warmus walked back toward Williams, and Shoaff heard three quick pops that he knew were gunshots. Shoaff said that Williams made no aggressive moves toward Warmus after Warmus started for the trunk of his car. The state then asked, "[D]id you believe that [Warmus] was in imminent fear of his life?" Shoaff replied, "[N]o."

{¶ 18} Cleveland police detective Lem Griffin investigated the murder. In describing the guidelines that the police had to follow before they could use deadly force, Griffin explained that it was a continuum in which the force used had to be proportionate to the threat. The state then asked, "[B]ased on your understanding of deadly force, would you be permitted to use deadly force in response to a real strong headlock?" Griffin replied, "[N]o." He further explained that before a police officer could fire a gun in response to danger, the officer had to be "not 100 percent sure, but sure enough that you feel there's an imminent threat on your life." Finally, in response to the question "[I]f someone is putting you in danger but you had the opportunity to safely leave, by law do you have to exercise that opportunity," Griffin replied, "[Y]ou should, sir."

C

{¶ 19} To the extent any witnesses who actually testified to seeing the altercation that led to the shooting gave their opinions that deadly force was unwarranted under the circumstances, those opinions were properly admitted under Evid.R. 701.

{¶ 20} Although Ohio uses a subjective standard for self-defense, the state is not barred from offering testimony to counter what the defendant "subjectively" claims to have believed at the time. In *Koss,* the Supreme Court approved a jury instruction on the reasonableness of a defendant's use of deadly force that stated: "In determining whether the Defendant had reasonable grounds for an honest belief that she was in imminent danger, you must put yourself in the position of the Defendant * * *. You must consider the conduct of [the assailant] and determine if such acts and words caused the Defendant to reasonably and honestly believe that she was about to be killed or to receive great bodily harm." 49 Ohio St.3d at 216. The Supreme Court later described this as "a combined subjective and objective test." *Thomas,* 77 Ohio St.3d at 330. This was consistent with previous decisions holding that a defendant's use of deadly force was to be viewed "on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." *State v. Sheets* (1926), 115 Ohio St. 308, 310, 152 N.E. 664.

{¶ 21} The opinions were offered by eyewitnesses who actually saw events unfold. The opinions were thus helpful to giving the jury a clear understanding of whether Warmus could reasonably believe that deadly force was necessary and whether he exercised sound judgment in doing so. The court did not err by allowing the opinions into evidence.

D

**{¶ 22}** Detective Lem Griffin did not witness the shooting, so he could not give a lay opinion as to whether Warmus was justified in using deadly force. See *Johnson*, 10th Dist. No. 02AP-373, at ¶ 36. At no point in Griffin's testimony, however, did the court permit him to give his opinion on whether Warmus was justified in shooting Williams—the detective only testified to his opinion of when a *police officer* could use deadly force under similar circumstances and that he did not believe that a headlock constituted an imminent threat on one's life. This might seem like a fine distinction to make, but the state's line of questioning to this witness was prompted by an assertion made in defense counsel's opening statement:

**{¶ 23}** "The third thing that the evidence as a whole shows is that Mr. Warmus responded to the gun threat just as a police officer would have responded. We certainly expect that a police officer confronted with or confronting a suspect who has a gun pulled or even appears to be pointing a gun, we expect that police officer to shoot until the gun drops in self-defense, and that's what Matt did."

**{¶ 24}** By referring to what police officers would have done under similar circumstances, Warmus opened the door to testimony by police officers on how they would have responded in a similar situation. Though opening statements of counsel are not evidence, *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000, they usually state the defense's theory of the case. Defense counsel told the jury that the evidence would show that Warmus "responded to the gun threat just as a police officer would have responded." The state was thus entitled to offer police testimony to rebut that assertion by offering evidence from police officers to the effect that officers acting in

similar circumstances would not have resorted to deadly force. Cf. *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 44 (when a victim's credibility is attacked during opening statements, the prosecution can present rehabilitative evidence during the state's case-in-chief); *United States v. Marin* (C.A.1, 2008), 523 F.3d 24, 31. Griffin's testimony viably countered Warmus's assertion by showing that he, as a police officer, would not in similar circumstances have used deadly force. There was nothing improper about either the state's question or the detective's answer.

II

{¶ 25} Warmus complains that the court erred by allowing a state expert to invade the province of the jury by testifying outside his area of expertise to an ultimate issue to be decided by the jury. The witness, an expert in audio and video technology, examined a recording of a 9-1-1 call made from the scene of the shooting. He testified that after optimizing the audio track for clarity, he could hear Warmus arguing with a bystander saying, "[I]f my gun's here, it's my fault." Warmus disagreed with the expert's conclusion, offering his own transcription of the 9-1-1 call in which he claimed he said, "[I]t's his gun. Why are you going to say it's my fault. Why?" He maintains that the jury should have been allowed to draw its own conclusions about what words were spoken.

{¶ 26} An audio recording made contemporaneously with events is always the best evidence of that event. *Harleysville Mut. Ins. Co. v. Santora* (1982), 3 Ohio App.3d 257, 260-261, 444 N.E.2d 1076. The court may in its discretion allow a transcript of an audio recording to be presented to the jury as a *listening aid* as long as there are no material differences between the recording and the transcript. *State v. Waddy* (1992), 63 Ohio

St.3d 424, 445, 588 N.E.2d 819. When a party disputes the accuracy of a transcribed recording, a person who was present and who heard the conversation in question at the time the recording was made may testify for the purpose of clarifying inaudible or unintelligible portions of the tape. See Evid.R. 602; *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 100; *State v. Gearo* (July 1, 1993), 8th Dist. No. 63056.

**{¶ 27}** The state's expert was not present at the scene when the 9-1-1 call was made. Nevertheless, courts have allowed expert testimony to clarify garbled or unintelligible audio recordings. In *State v. Williams* (1983), 4 Ohio St.3d 53, 446 N.E.2d 444, the syllabus states:

**{¶ 28}** "The Ohio Rules of Evidence establish adequate preconditions for admissibility of expert testimony, such as spectrographic voice analysis. It is within the sound discretion of the state's judiciary, on a case by case basis, to decide whether such testimony is relevant and will assist the trier of fact to understand the evidence or to determine a fact in issue."

**{¶ 29}** The state's expert testified that he enhanced the audio on the recording of the 9-1-1 call, and Warmus does not contest the manner in which the 9-1-1 call was enhanced. He does, however, contest the expert's interpretation of the words spoken. He claims that expertise in filtering audio recordings is not the same thing as expertise in being able to decipher words. He argues that the expert failed to explain how his training and background gave him the ability to interpret the words spoken on the audio recording.

**{¶ 30}** The court should not have allowed the expert to render an opinion as to what words he heard spoken on the tape. Because Warmus and the state fundamentally disagreed on what words were spoken, this became a factual issue for the jury to resolve. The court should have instructed the jury that the interpretation of what words were spoken on the 9-1-1 tape was for it to decide and that the audio recording was the best evidence.

**{¶ 31}** Despite this error, we cannot say that it was prejudicial. Having independently reviewed the audio of the 9-1-1 call, we cannot confidently say that either interpretation by the state or defense was completely accurate. The jury heard the audio and was able to compare it to the transcriptions made by both parties and weigh them against the actual recording. Moreover, to the extent that the jury may have given undue weight to the expert's conclusions, that error was certainly harmless given the overwhelming evidence of Warmus's guilt. Even had the court excluded the expert's testimony, there is no probability that the outcome of the trial would have been different.

III

**{¶ 32}** The coroner testified that Williams had been shot twice in the abdomen and once behind the left ear. The state later made several references to the shot behind the ear as an "execution-style" shooting; for example, asking Warmus during cross-examination: "Where did you learn that type of military style execution?" Warmus complains that continued references to the shot behind the victim's ear as an execution-style shot constituted prosecutorial misconduct.

A

**{¶ 33}** We analyze claims of prosecutorial misconduct by determining "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. Ultimately, this means we must determine whether "the conduct complained of deprived the defendant of a fair trial." *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136, citing *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394.

B

**{¶ 34}** One of Warmus's gunshots struck Williams behind the left ear, leaving what the coroner described as a "neurologically incapacitating wound" that severed the victim's brainstem. Both the coroner and trace-evidence expert found stippling (or gunshot residue) near the wound, indicating that Warmus had fired the gun from a distance of between 12 and 24 inches from the victim. Although Warmus claimed that he had been aiming only at the victim's gun, there was evidence that the three shots he fired were "two initial shots, a pause, and then a final third shot." The gunshots to the abdomen were located no more than a quarter of an inch apart, implying that they had been fired in quick succession. The third shot thus could have corresponded to the bullet wound near the victim's ear.

**{¶ 35}** Given the entry point of the bullet at the back of the head and the close proximity from which the gun was fired, the state's remarks about an execution-style shooting were not improper. Courts have previously described similar shootings as "execution-style." For example, in *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426,

892 N.E.2d 864, the Supreme Court described four gunshots, at least three of which were "at close range, to the head" as an "execution-style" murder. Id. at ¶ 139. See also *State v. Palmer (1997)*, 80 Ohio St.3d 543, 570, 687 N.E.2d 685 (describing as "execution-style manner" shots fired on either side of the victim's head into his temple).

{¶ 36} Assuming that the shot to the back of the victim's head followed the two quick shots to the abdomen, it could be inferred that there was a slight pause as the victim's body twisted from the initial shots. This pause, however momentary, could have allowed Warmus to aim his gun at the back of the victim's head. Under this scenario, Warmus could accurately be said to have fired a "kill" shot or have engaged in an execution-style shooting. The state did not commit misconduct by so characterizing the shot to the back of the head.

C

{¶ 37} Warmus next argues that the state committed misconduct by creating the impression that he illegally transported his firearm, despite not being charged with that offense. The state argues that this was other-acts evidence under Evid.R. 404(B) and properly introduced to counter Warmus's assertion on direct examination that the "most trouble" he had been in before the shooting was "a speeding ticket."

{¶ 38} Questions about Warmus's transportation of a loaded firearm did not reasonably fall within any exception to the prohibition on other-acts evidence under Evid.R. 404(B). They did not touch on "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The state cites no

exception for admissibility under the rule, nor can we discern any plausible basis for application of the rule.

{¶ 39} The questions were likewise inadmissible to impeach Warmus on his assertion that he led a law-abiding life. R.C. 2923.16(B) defines the offense of improperly handling firearms in a motor vehicle and states: "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Warmus testified that he took firearms seriously and that he received training in firearm use and handling but was unaware that it was illegal to transport a loaded firearm in a vehicle when that firearm was within reach of the driver or passenger. The state now claims that "it did not create the impression that the Appellant illegally transported a firearm in his vehicle," but what happened at trial belies this claim. The state asked Warmus whether he was familiar with R.C. 2923.16(B) and later said, "[Y]ou had no idea that it was illegal to convey a loaded weapon?" Finally, the state characterized Warmus's act of transporting a loaded gun inside the car as "committing a crime by conveying it." These questions created the impression that Warmus had broken the law, as the phrase "committing a crime" allows for no other reasonable conclusion but that Warmus illegally transported a firearm.

{¶ 40} Despite the error in the state's questions, we cannot find them so prejudicial that they deprived Warmus of a fair trial. Warmus conceded that he shot the victim, so questions about whether he illegally transported his firearm paled by comparison. We do not think it is remotely possible that questions about Warmus's illegally transporting the

gun somehow swayed the jury into rejecting the self-defense claim. Any misconduct by the state was thus harmless beyond a doubt.

D

{¶ 41} Warmus raises other claims of prosecutorial misconduct but does not separately argue why these claimed instances deprived him of a fair trial. This constitutes a failure under App.R. 16(A)(7), which requires the appellant to raise an argument "with respect to each assignment of error presented for review and the reasons in support of the contentions."

IV

{¶ 42} The fourth assignment of error complains that R.C. 2901.05(A), which requires the defendant to bear the burden of proof when raising a self-defense claim, is unconstitutional. We assume that Warmus raises this assignment only to preserve it for further federal review because the United States Supreme Court approved R.C. 2901.05(A) in *Martin v. Ohio* (1987), 480 U.S. 228, 233-234, 107 S.Ct. 1098, 94 L.Ed.2d 267. As an inferior court to the United States Supreme Court, we have no ability to overturn *Martin*.

{¶ 43} Warmus argues that *Martin* should be reviewed in light of the United States Supreme Court's decision in *Dist. of Columbia v. Heller* (2008), 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637, in which the Supreme Court held that the Second Amendment to the United States Constitution conferred an individual right to keep and bear arms, that statutes banning handgun possession in the home violated the Second Amendment, and that any statute containing a prohibition against rendering any lawful firearm in the home operable for purposes of immediate self-defense violated the Second Amendment. *Heller*

also held that the right to self-defense was a "central component" to the right to bear arms, id. at 599 (emphasis omitted), so Warmus argues that placing the burden of proof on a person claiming to act in self-defense runs counter to the purpose of the Second Amendment.

{¶ 44} Courts, in light of *Heller*, have been analyzing Second Amendment claims under a two-prong approach.   For example, in *United States v. Marzzarella* (C.A.3, 2010), 614 F.3d 85, the United States Court of Appeals for the Third Circuit stated:

{¶ 45} "As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges.   First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.   *Cf. United States v. Stevens*, 533 F.3d 218, 233 (C.A.3, 2008), *aff'd* ___ U.S. ___, 130 S.Ct. 1577, 176 L.Ed.2d 435 (recognizing the preliminary issue in a First Amendment challenge is whether the speech at issue is protected or unprotected).   If [the law] does not [impose such a burden], our inquiry is complete.   If it does, we evaluate the law under some form of means-end scrutiny.   If the law passes muster under that standard, it is constitutional.   If it fails, it is invalid." (Footnote omitted.) Id. at 89. See also *United States v. Chester* (C.A.4, 2010), 628 F.3d 673, 680 (a "two-part approach to Second Amendment claims seems appropriate under *Heller*"); *United States v. Reese* (C.A.10, 2010), 627 F.3d 792, 800-801 (same); *United States v. Skoien* (C.A.7, 2010), 614 F.3d 638, 641-642 (en banc).

{¶ 46} Nothing in R.C. 2901.05(A) imposes a burden on conduct protected by the Second Amendment.   It is important to understand the distinction between the right to carry a firearm (which Warmus lawfully exercised at the time of the shooting) and the

limits the law places on how one can defend oneself. At the time of the amendment's framing, prevailing attitudes on self-defense required a duty to "retreat to the wall" in cases that did not involve the defense of one's home. See *Erwin v. State* (1876), 29 Ohio St. 186, 194. While the duty to retreat has been rejected by many states in modern times, see Forell, What's Reasonable?: Self-Defense and Mistake in Criminal and Tort Law (Winter 2010), 14 Lewis & Clark L.Rev. 1401, 1403, fn. 5, it undeniably existed when the Second Amendment was adopted. That Ohio continues to require a duty to retreat before the use of deadly force in self-defense has no impact on Warmus's right to possess a firearm.

{¶ 47} The Ninth Appellate District recently addressed and rejected this same argument in *State v. Geter-Grey*, 9th App. No. 25374, 2011-Ohio-1779, finding that *Heller* "did not in any way modify the underlying right to self-defense." Id. at ¶ 26. We agree, as nothing in *Heller* purports to alter the way the states have defined self-defense. It recognizes there is a right to self-defense and, at best, stands for the proposition that whenever the use of deadly force is justified when acting in self-defense, a person can use "arms," including firearms.

V

{¶ 48} For his fifth assignment of error, Warmus complains that the court erred by failing to conduct a hearing pursuant to *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, after the trial judge told the parties that he gave a juror a ride to the courthouse during the trial.

{¶ 49} The judge explained on the record that while driving to the courthouse he received a telephone call informing him that an alternate juror was unable to find

transportation to the courthouse. Knowing that the defense was presenting expert witnesses with a very tight window of availability and that one juror was about to give birth to a child, the judge decided to meet the juror and give him a ride to the courthouse. The judge said that he dropped the juror off in front of the Justice Center before proceeding to park his car. The court waited until the two expert witnesses testified before informing the parties. The court assured the parties that "at no time did I have any conversation with this juror about any aspect of this case. We didn't mention the trial, no Matthew Warmus or any witnesses or anything with this case at all." The court told the parties that "I will permit you all to think about it and motion it if you wish" and further told them that he would "permit you to depose the juror at the conclusion of the litigation if you wish." Neither party objected nor did Warmus depose the juror at the end of trial.

{¶ 50} In *Remmer*, the United States Supreme Court stated:

{¶ 51} "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." Id. at 229.

{¶ 52} Nonetheless, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. * * * Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge

ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* * * *." *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 53} Warmus did not object to the court's actions when given a clear opportunity to do so, therefore he has forfeited the right to argue anything but plain error on appeal. See *State v. Lewers*, 5th Dist. No. 2009-CA-00289, 2010-Ohio-5336, ¶ 78. We find no plain error. *Remmer* creates a presumption that any contact or communication about "the matter pending before the jury" is prejudicial. The judge clearly understood this rule of law and made it clear to the parties that he and the juror did not discuss the case—they spoke about a football game and other sports. It may have been better for the court to arrange for someone else to drive the juror to the courthouse, but the judge took pains to prevent any conversation about the trial. Moreover, it is difficult for Warmus to argue that he was prejudiced by the court's actions when those actions undeniably assisted the defense—one of Warmus's experts could only testify between 9 a.m. and 12 p.m. that day. Had the court been forced to postpone trial for a day or even a few hours, the expert would not have been available. By giving the juror a ride, the court ensured that Warmus could offer the expert's testimony.

## VI

{¶ 54} During the direct examination of a police officer, who was one of the first law-enforcement officials to arrive on the scene, the officer testified that he heard Warmus's companion say, "I knew bad things were going to happen." The court allowed

the statement into evidence as an excited utterance. Warmus argues that the companion's statement did not meet the requirements for being an excited utterance because the statement was too remote in time to the startling event.

A

{¶ 55} Although hearsay, excited utterances are excepted from the hearsay rule under Evid.R. 803(2) as long as the statement relates to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. In *State v. Duncan* (1978), 53 Ohio St.2d 215, 373 N.E.2d 1234, the Ohio Supreme Court established a four-part test to determine whether a hearsay statement is admissible under Evid.R. 803(2): the proponent of the statement must establish that (1) there was an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have had an opportunity to personally observe the startling event. Id. at paragraph one of the syllabus, approving and following *Potter v. Baker* (1955), 162 Ohio St. 488, 124 N.E.2d 140, paragraph two of the syllabus. As with other kinds of evidentiary rulings when the court is required to make a factual finding as a predicate for admitting evidence, the court's finding that a statement qualifies as an excited utterance is within its discretion, reviewable only for an abuse of that discretion. *State v. Graham* (1979), 58 Ohio St.2d 350, 390 N.E.2d 805.

{¶ 56} The victim's shooting was a startling event to Warmus's companion. Her statement related to the shooting, and she personally witnessed the shooting. The only

point of contention is the second element—whether the statement had been made while she was under the stress of excitement caused by the event.

{¶ 57} The evidence showed that the police responded to the scene within moments of the shooting—Warmus himself testified that he was still on the telephone with the 9-1-1 operator when the police arrived. The officer who related the companion's statement said that he looked into the open trunk of Warmus's car, saw the gun, and moved to secure it. At the same time, Warmus's companion tried to retrieve her purse from the trunk. The officer "yelled at [her] not to go in the trunk," at which time she "fell to pieces," collapsed on the ground beside the trunk, and said words to the effect that she knew "when [Warmus] went to the trunk of the car that bad things were going to happen." The officer said that by "falling to pieces" he meant that she became "hysterical" when told that she could not retrieve her purse from the trunk of Warmus's car.

{¶ 58} We cannot find that the court's decision to admit the companion's statement as an excited utterance was an abuse of discretion. The evidence showed that police responded almost immediately after the shooting and the court could rationally have concluded that the companion was still in an excited condition after having witnessed a shooting death just moments earlier. As Warmus concedes, there are no rigid rules for determining what length of time constitutes too much time for the kind of reflection that would qualify a statement as spontaneous. *Duncan*, 53 Ohio St.2d at 219-220. Given the "hysterical" nature of the companion's response to being told not to retrieve her purse, spontaneity seemed assured, as it was unlikely that her comment had been the product of conscious thought. Instead, it was an organic comment, made under the stress of having

witnessed Warmus shoot a parking lot attendant over a $10 dispute, and thus one the trustworthiness of which seemed unassailable. The court was acting well within its discretion by allowing the companion's statement into evidence as an excited utterance.

B

{¶ 59} Warmus also complains that even if the statement qualified as a hearsay exception, the state could not use it as extrinsic evidence to impeach the companion, who earlier denied making the statement.

{¶ 60} Extrinsic evidence is inadmissible to impeach a witness on a collateral matter having no bearing on the issue to be decided at trial. See *State v. Smith*, 10th Dist. No. 04AP-726, 2005-Ohio-1765, ¶ 39. Extrinsic evidence may be admissible to impeach a witness under Evid.R. 616(C), but only if the extrinsic evidence is permitted by Evid.R. 608(A), 609, 613, 616(A) or (B), or 706, or by the common law of impeachment not in conflict with the Rules of Evidence. *State v. Spence*, 10th Dist. No. 05AP-891, 2006-Ohio-6257, ¶ 62.

{¶ 61} But we need not decide whether the state improperly used the officer's testimony to impeach the companion because while "portions of testimony may be inadmissible for some purposes, they may also be found admissible for other purposes." *Buck v. Dayton Heidelberg Distrib. Co., Inc*. (Nov. 29, 1983), 2d Dist. No. 8067. When the state offered the officer's testimony, Warmus objected on impeachment grounds, but the state claimed that it was offering the testimony as an excited utterance. The court specifically admitted the statement as an excited utterance, a decision that we have found

was not an abuse of discretion.   Because the statement was admissible for that purpose, it is immaterial whether it violated any other rules of evidence.

VII

**{¶ 62}** In his seventh assignment of error, Warmus complains of several instances in which he claims the court unfairly restricted his ability to cross-examine numerous state witnesses.   These "numerous" state witnesses were, in fact, only two in number:   Eric Livingstone and Detective Lem Griffin.   We restrict our discussion accordingly.

A

**{¶ 63}** The Fifth and Sixth Amendments provide a criminal defendant the right to present a defense by compelling the attendance and presenting the testimony of witnesses for the defense.   *Washington v. Texas* (1967), 388 U.S. 14, 18-19, 87 S.Ct. 1920, 18 L.Ed.2d 1019.   In addition, "[t]he necessary ingredients of the [Fifth and] Fourteenth Amendment[s'] guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony."   *Rock v. Arkansas* (1987), 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37.

**{¶ 64}** The right to present a criminal defense, however, is not absolute.   *United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, 875, 102 S.Ct. 3440, 73 L.Ed.2d 1193. The defendant is entitled to only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."   *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15.   Accordingly, the court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about,

among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674. To establish a Confrontation Clause violation, the defendant must show that he was "prohibited from engaging in otherwise appropriate cross-examination" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination." Id. at 680.

B

{¶ 65} Livingstone gave his opinion that Warmus was not in any danger at the time he retrieved his gun and shot the victim. On cross-examination, defense counsel asked: "Now, from your vantage point, when you say this all happened and you say that you never saw [the victim] pull or point a gun, you must be surprised ultimately to find out the [the victim] actually had a gun out before he was shot?" The court sustained the state's objection and ordered defense counsel to rephrase the question. Defense counsel then asked, "[W]ere you surprised to find out ultimately that [the victim] in fact had a gun out before he was shot?" The state again objected. At the sidebar, the court told defense counsel that he was mischaracterizing prior testimony by an emergency medical technician. The court told defense counsel: "I'll permit you to ask do you know if a gun was found, do you know when the gun came out, do you know if the gun was out before he was shot, but to say that the EMS guy said the gun was out before he was shot is not technically accurate." Defense counsel told the court that he had the right to ask any question on cross-examination and that he was "not tying it into what the EMS person

said." Defense counsel admitted to the court that up to that point in the trial, no person had testified to seeing the victim having "a gun out."

{¶ 66} As defense counsel was forced to concede, there had been no testimony prior to that point in trial where any witness claimed to have seen Williams holding a gun. During questioning of the emergency medical technician who treated the victim on the scene, the technician responded to the statement, "[B]ut you definitely recall seeing a gun near [the victim's] head on the pavement" by saying, "I did not see a weapon." So any question posed to Livingstone that presumed that the victim "actually had a gun out before he was shot" had no basis in fact. The court did not abuse its discretion by sustaining the state's objection to it because the question had the potential to confuse the jury by injecting facts not in the record. Moreover, Livingstone's testimony that Warmus could have safely retreated without shooting Williams was premised on his opinion that he did not see Williams holding a gun and that Warmus was in no danger from Williams. Even had Livingstone been aware that the victim possessed (but did not display) a gun, that fact would have been immaterial to his conclusion that Warmus was not in any danger at the time he went to his trunk and retrieved his gun.

C

{¶ 67} During Detective Lem Griffin's testimony, he gave his understanding of the circumstances under which a police officer would be justified in using deadly force. On cross-examination, Griffin acknowledged that he was not a lawyer, and defense counsel asked, "[S]o the legal opinions you just expressed are not the opinions of a lawyer." The court sustained the state's objection.

**{¶ 68}** The court did not abuse its discretion by sustaining the objection. Griffin's opinions were based on questions premised on the idea of how a police officer would have responded in the same situation—a premise first put forth by Warmus in opening statement when he claimed that he responded to the victim's threat in the same way a police officer would have responded. Griffin's opinion was thus grounded on his personal experience as a police officer, not as an attorney, a fact he readily acknowledged in his testimony. Defense counsel's question was thus misleading and arguably intended to confuse the jury on issues that were not relevant. In any event, by conceding that he was not an attorney, Griffin arguably answered the defense's question about whether his opinions were that of a lawyer. Warmus can show no prejudice.

### VIII

**{¶ 69}** Warmus next complains that the court gave an inaccurate jury instruction on self-defense.

**{¶ 70}** Before closing argument, the court gave this preliminary instruction to the jury:

**{¶ 71}** "If you find that the *State* proved beyond a reasonable doubt all of the essential elements of the offense of self-defense against the danger of death or great bodily harm, and if you further find that the defendant failed to prove by a preponderance of the evidence the defense of self-defense, then your verdict must be guilty, so on the other hand, if you find the *State* failed to prove beyond a reasonable doubt any one of the essential elements of the offense of self-defense against danger of death or great bodily

harm, or if you find that the defendant proved by a preponderance of the evidence the defense of self-defense, then you must find the defendant not guilty." (Emphasis added.)

{¶ 72} Warmus complains, and the state agrees, that the court erroneously transposed the word "state" for "defendant" in the instruction, thus creating confusion as to the proper law the jury was to apply in its deliberations. Importantly, however, Warmus did not object to the court's instruction. Crim.R. 30 prohibits an appealing party from assigning as error the giving of a jury instruction unless a party objected to the instruction before the jury retired to consider its verdict. When there is a failure to object as required by Crim.R. 30, the allegedly faulty instruction is subject to review only for plain error. *State v. Adams* (1980), 62 Ohio St.2d 151, 154, 404 N.E.2d 144. Plain error exists only if "the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 73} Although the court's preliminary instruction erroneously told the jury that the state bore the burden of proving self-defense, the court made it clear to the jury that written instructions would be provided for their use and stated, "[Y]ou'll be able to refer to it and review it as often as you like, okay?" Those written instructions correctly stated that Warmus bore the burden of proving self-defense by a preponderance of the evidence. Given the strength of the evidence against Warmus's claim of self-defense, we have no reason to believe that the jury based its conclusion on an erroneous transposition about who bore the burden of proof.

IX

{¶ 74} The ninth assignment of error is that counsel was ineffective for failing to request a *Remmer* hearing and for failing to object to the jury instruction regarding the burden of proof on self-defense.

A

{¶ 75} A claim of ineffective assistance of counsel requires a defendant to show that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. This analysis requires two distinct lines of inquiry. First, we determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. When making this inquiry, we presume that licensed counsel has performed in an ethical and competent manner. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 209 N.E.2d 164. Second, we determine whether "the defense was prejudiced by counsel's ineffectiveness." *Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373. Prejudice requires a showing to a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at paragraph three of the syllabus.

B

{¶ 76} Although counsel did not request a *Remmer* hearing upon learning that the trial judge gave an alternate juror a ride to the courthouse, we stated in our discussion of the fifth assignment of error that a *Remmer* hearing was unnecessary because the judge made it

clear that he did not discuss anything about the case with the juror. The judge explained that he studiously avoided any conversation relating to the case. Defense counsel had no reason to doubt the court's recapitulation of the conversation and offered no objection to the way the court handled the matter. Defense counsel thus exercised his judgment that no impropriety occurred. Even were we of a mind to second-guess this decision, nothing on the record suggests to us that the court's explanation was so lacking in veracity that a full *Remmer* hearing was necessary.

C

{¶ 77} Regarding the preliminary jury instruction on self-defense, we agreed that the court erred by transposing the word "state" for "defendant" when assigning the burden of proving self-defense. Counsel had an obligation to object to this instruction under Crim.R. 30 and failed to do so, thus violating an essential duty.

{¶ 78} We nonetheless find that even had the court correctly stated the burden of proof in its preliminary instructions to the jury, there is no reasonable probability that the outcome of the trial would have been different. The evidence overwhelmingly showed that Warmus could have safely retreated without resorting to deadly force. Indeed, while the victim did possess a firearm, none of the many eyewitnesses to the shooting saw that weapon. At best, one witness, who worked with the victim, said only that he "tried to reach for his gun" at the time he was shot but that he did so only because Warmus had first pulled out his own gun.

{¶ 79} Warmus was the only witness to say that the victim pulled the gun first, a claim made in self-interest and against the great weight of the testimony. Every other

witness agreed that the fight had ended and that the victim had turned away from Warmus and resumed tending to parking-lot customers. Warmus could have easily and safely retreated without resorting to deadly force. And if Williams had pulled a gun first, it is unclear how Warmus thought it believable that he could walk to his car, retrieve his gun, and return to Williams while aiming a gun at him. If Williams had manifested an immediate intention to shoot Warmus, surely Warmus would not have risked walking to the trunk of his car to get a gun, all the while being held at gunpoint himself. The jury obviously found Warmus's version of events unbelievable.

{¶ 80} Finally, to the extent that the court erred in instructing the jury on the burden of proof, it is difficult to see how that error was prejudicial to Warmus. In his fourth assignment of error he complained that Ohio's statutory requirement that a defendant bear the burden of proof on self-defense was unconstitutional because the burden should rest with the state. Assuming that the jury did put the burden of proving self-defense on the state, it inadvertently gave Warmus what he wished for all along. Even if the instruction did confuse the jury, that confusion would undoubtedly have worked in Warmus's favor, as it might have caused the jury to split on whether he or the state proved the elements of self-defense. He cannot now complain that he was prejudiced by the court's error, and we find no basis for finding that the outcome of the trial would have been different had the jury been correctly instructed.

X

{¶ 81} The tenth assignment of error is that cumulative errors deprived Warmus of a right to a fair trial.

**{¶ 82}** The cumulative-error doctrine states that "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner (1995)*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623. However, "'[t]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068, quoting *United States v. Hasting* (1983), 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96.

**{¶ 83}** As we have previously discussed, the only demonstrable errors we have found to this point are the court's decision to allow an audio expert to testify to his interpretation of words spoken on an audio recording of a 9-1-1 call, the state's misconduct in questioning Warmus about the illegal transportation of a firearm, and the court's inadvertent transposition of which party bore the burden of proving self-defense. These errors neither adversely affected the outcome of trial nor cumulatively affected Warmus's right to a fair trial.

XI

**{¶ 84}** Finally, Warmus complains that the court erred as a matter of law by imposing a fine of $20,000, claiming that under R.C. 2929.02(B)(4) the maximum allowable fine for murder is $15,000. The state concedes the court's error, and we agree. We therefore sustain this assignment of error and remand with instructions for the court to modify the fine to $15,000.

**{¶ 85}** This cause is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

Judgment affirmed in part

and reversed in part,

and cause remanded.

---

CONWAY COONEY and GALLAGHER, JJ., concur.