[Cite as *State v. Inman*, 2014-Ohio-786.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                       :
                                   Case No. 13CA3374

vs.                                                         :

                                   DECISION AND
WILLIAM A. INMAN,                          :    JUDGMENT ENTRY

    Defendant-Appellant.                      :    RELEASED 02/28/2014

APPEARANCES:

David A. Sams, West Jefferson, Ohio, for Appellant.

Michael DeWine, Attorney General of Ohio, Thomas N. Anger, Assistant Attorney General of Ohio, and Debra Gorrell Wehrle, Assistant Attorney General of Ohio, Columbus, Ohio, for Appellee.

Hoover, J.

{¶ 1}  This is an appeal from a Ross County Court of Common Pleas judgment of conviction and sentence. William A. Inman, defendant below and appellant herein, was convicted by a jury of two counts of aggravated murder, murder, kidnapping, tampering with evidence, and gross abuse of a corpse. Appellant was sentenced to life imprisonment without the possibility of parole. For the following reasons, we affirm the judgment of the trial court.

I.      Summary of the Case

{¶ 2}  On May 20, 2011, a Hocking County Grand Jury indicted appellant on aggravated murder, with death penalty specifications, in violation of R.C. 2903.01(A) and R.C. 2941.14; aggravated murder, with death penalty specifications, in violation of R.C. 2903.01(B) and R.C. 2941.14; murder in violation of R.C. 2903.02(A); kidnapping in violation of R.C. 2905.01(A)(3);

tampering with evidence in violation of R.C. 2921.12(A)(1); and gross abuse of a corpse in violation of R.C. 2927.01(B). Appellant's son and co-defendant, William Inman II, was likewise indicted, tried, and convicted on identical charges. *See State v. Inman*, 4th Dist. Hocking No. 12CA16, 2013-Ohio-3351, ¶ 12. Inman II was tried first, in Hocking County, and because pre-trial publicity proved prejudicial, appellant's case was transferred to Ross County, Ohio. A jury found appellant guilty of all the charged crimes and, following a mitigation hearing, recommended a sentence of life imprisonment without the possibility of parole. The trial court accepted the jury's recommendation and imposed the life with no possibility of parole sentence.[1] For her role in this tragedy, appellant's wife, Sandra Inman, pled guilty to murder. *See State v. Sandra K. Inman*, Hocking County Common Pleas Court No. 11-CR-43.

{¶ 3} The charges against appellant stemmed from the kidnapping and murder of Summer Cook Inman. During the late evening hours of March 22, 2011, Summer was kidnapped outside the Century National Bank in Logan, Ohio, where she worked as a janitor. Her body was found a week later, left inside the septic tank behind the Faith Tabernacle Church in nearby Nelsonville, Ohio. Three industrial grade zip ties had been used to bind Summer's hands, and a fourth zip tie had been fastened around Summer's neck. Appellant was Summer's father-in-law; Sandra Inman was Summer's mother-in-law; and William Inman II was Summer's estranged husband.

{¶ 4} The state's basic theory of the evidence at trial is briefly summarized as follows. On the evening of March 22, 2011, appellant, his son William Inman II, and his wife Sandra Inman, kidnapped Summer Cook Inman from the parking lot of the Century National Bank. Summer and Inman II were in the midst of a contentious divorce and custody dispute involving

---

[1] Separate sentences of imprisonment on the kidnapping, tampering with evidence, and gross abuse of a corpse charges were ordered to be served consecutive to each other, and prior to and consecutive to the life without possibility of parole sentence.

their children. Shortly after forcing Summer into the backseat of their vehicle, Summer was strangled to death by the fastening of the zip tie around her neck. The Inmans then drove to the Faith Tabernacle Church, a church that they were intimately familiar with, and disposed of Summer's body in the church septic tank. The Inmans then made a return trip to northeastern Ohio, where they were living at the time, making stops along the way to clean the vehicle and to change the physical appearance of the vehicle.

{¶ 5} The state presented three individuals who witnessed the kidnapping of Summer on the evening of March 22, 2011. Each witness testified that a white car, which resembled an old police cruiser, was sitting in an alley by the bank. A woman with blond hair was in the front seat of the vehicle. Two men were beside the rear passenger door of the vehicle holding a stun-gun on a white female victim. The victim was lying on the ground in a fetal position, and each witness testified to hearing loud screams coming from the victim. One witness testified that he tried to approach and help the victim. He testified that he witnessed the two men hold the stun-gun on the victim. When he was noticed, one of the male perpetrators pepper-sprayed him, causing him to temporarily lose his eyesight. All the witnesses confirmed that the men wore dark clothing and two of the witnesses testified that the men wore facemasks. Two of the witnesses testified that they saw the two men throw the victim into the back seat of the vehicle. The same witnesses testified that the blond haired female was driving the vehicle.

{¶ 6} It was also adduced at trial that the appellant had purchased a white 2003 Ford Crown Victoria on or about March 18, 2011, from Majestic Motors of Akron, Ohio. The Streetsboro, Ohio Police Department, had previously owned the Crown Victoria. The rear passenger locks had been disabled, thereby preventing the rear doors from being opened from the inside of the vehicle.

{¶ 7}   Two additional witnesses testified for the state regarding the events on the night Summer was kidnapped. Colton Kilkenny testified that around 11:30 p.m. on the evening in question, he was driving along Route 33 in Nelsonville, Ohio, when he observed what appeared to be a white police cruiser parked at the Faith Tabernacle Church. Kilkenny was so convinced that the vehicle was a police cruiser that he slowed down in hopes of avoiding a speeding ticket. Chrystal Farris also testified for the state. Farris testified that she also saw the white vehicle, what she thought was an older model Crown Victoria, parked at the church in the late evening hours. Farris further testified that she saw two men standing outside the vehicle and a blond or redheaded woman in the front seat.

{¶ 8}   The Inmans were immediately identified as suspects, given the pending divorce between Inman II and Summer and the eyewitness accounts of the abductors (Sandra Inman had blond hair at the time of the kidnapping). Law enforcement officers questioned the Inmans in the hours and days immediately following Summer's disappearance. A search warrant for the house in which the Inmans were staying in Akron, Ohio, was also obtained and executed. Among other items, a Garmin GPS unit, as well as the cell phones of appellant and Inman II were seized upon execution of the warrant. The white Crown Victoria was also seized and searched for evidence.

{¶ 9}   The Garmin GPS unit[2], along with the cell phone records of appellant and Inman II, placed the Inmans in Logan, Ohio at 5:45 PM on March 22, 2011. The GPS unit placed the Inmans in Logan until 8:07 PM, when the unit was turned off. The unit was turned back on at 11:46 PM in Nelsonville. From that point, the GPS traveled northbound through county township roads, going through the city of McConnelsville, then to Zanesville, across Interstate 70, and up Interstate 77 back to the Akron-Cleveland area. The GPS then stopped at the Blu Sonic Car

---

[2] The Inmans had admitted to law enforcement that they were traveling together on the night of March 22, 2011, and that they had the Garmin GPS unit with them on that night.  The Inmans denied, however, that they were in Logan, Ohio; instead the Inmans insisted that they were in Cleveland.

Wash in Seven Hills, Ohio, where video surveillance showed the Inmans cleaning out the Crown Victoria and dismantling and removing a black spotlight that was affixed to the vehicle.

{¶ 10} After leaving the car wash, the Inmans traveled to Pearl Road Auto Parts in Cleveland, Ohio. An employee of Pearl Road Auto Parts testified that on March 23, 2011, appellant traded him four almost new tires that were on the Crown Victoria for four lesser quality tires.

{¶ 11} Aaron Miller, Chief of the Logan Police Department, testified that on March 29, 2011, law enforcement, "based upon information developed during the investigation," was able to determine that Summer had been killed and that her body was located in the septic tank behind the Faith Tabernacle Church. Thus, exactly one week after Summer was kidnapped, the lid of the septic tank was removed and Summer's body was discovered head first in the septic tank. The only part of Summer's body that protruded above the sewage was one of her shoeless feet.

{¶ 12} Dr. Brian Casto, a deputy coroner employed at the Montgomery County Coroner's Office, performed Summer's autopsy. Dr. Casto testified that the official cause of death was homicide by means of ligature strangulation. Casto explained that the zip tie fastened around Summer's neck was made so tight that he had to wedge wire cutters under it to remove the tie. Dr. Casto also concluded that Summer was deceased prior to entering the septic tank.

{¶ 13} It was revealed during trial that upon completion of the state's case, appellant wished to call to the stand, former Chief Deputy Matt Speckman of the Hocking County Sheriff's Department, to elicit testimony regarding a portion of a statement that Sandra Inman made to Speckman on March 29, 2011. In particular, appellant wished to elicit a statement in which Sandra Inman told Speckman that her son, Inman II, was solely responsible for strangling Summer with the zip tie in the backseat of the vehicle, and that appellant was driving the vehicle

when Summer was killed. When the state was made aware of appellant's intention to introduce Sandra's statement, through Speckman, it raised an objection. A lengthy discussion regarding the admissibility of the statement was conducted outside the presence of the jury. The trial court ultimately determined that neither case law precedent nor the evidentiary rules permitted the introduction of the statement.

{¶ 14} At trial, appellant also attempted to introduce a portion of the state's opening statement from the trial of Inman II. In particular, appellant wished to introduce the prosecutor's remarks, made during opening statements, that it was Inman II that pulled the zip tie around Summer's neck. Again, after a lengthy discussion of the evidentiary rules, the trial court did not permit the appellant to introduce the statement.

{¶ 15} On February 4, 2013, the jury convicted appellant on all the counts listed in the indictment. A mitigation hearing was held on February 6, 2013. During the mitigation hearing, three witnesses testified on appellant's behalf, including Dr. James P. Reardon a licensed psychologist. The appellant also read an unsworn statement on his own behalf.

{¶ 16} At the conclusion of the penalty phase, the jury determined that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt; and the jury recommended that appellant should be sentenced to life imprisonment without the possibility of parole. The trial court subsequently held a sentencing hearing and ordered such sentence on the murder charges.

{¶ 17} On March 8, 2013, appellant filed a notice of appeal with this court.

## II.      Assignment of Error

{¶ 18} On appeal, appellant asserts the following assignment of error:

Assignment of Error:

DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL AND THE
RIGHT TO PRESENT A DEFENSE CONTRARY TO OHIO LAW AND THE
STATE AND FEDERAL CONSTITUTIONS.

{¶ 19} In support of his sole assignment of error, appellant contends that the trial court should have (1) permitted him to introduce Sandra's statement, through the testimony of Speckman; and (2) that the trial court should have allowed him to introduce the state's comments that were made during the opening statement of Inman II's trial. Appellant contends that both statements demonstrate that he was not the principal offender; and that he did not purposefully kill Summer. The state argues here, like it did at trial, that the statements are inadmissible hearsay. Appellant, on the other hand, contends that the statements are admissible under the rules of evidence and established case law.

### III.      Law & Analysis

#### A.      Standard of Review

{¶ 20} "The decision to admit or exclude evidence rests within the trial court's sound discretion. Thus, a reviewing court will not reverse the trial court's decision absent an abuse of discretion. The term 'abuse of discretion' implies that the court's attitude is unreasonable, unconscionable, or arbitrary." (Citations omitted.) *State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937, 964 N.E.2d 12, ¶ 24 (4th Dist.). "Furthermore, '[w]hen applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court.' " *Id*., quoting *In re Jane Doe I*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

#### B.      Admissibility of Sandra Inman's Out of Court Statement to Law Enforcement

{¶ 21} Appellant contends that Sandra Inman was unavailable to testify as a witness, and thus, her out-of-court statement to Speckman was admissible under Evid.R. 804(B)(3), which provides:

Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * *

*(3) Statement against interest.* A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

{¶ 22} Appellant argues that each of the requirements for the admission of Sandra's statement under Evid.R. 804(B)(3) was met. First, he asserts that Sandra was unavailable to testify as a witness by virtue of Evid.R. 601(B) – the spousal incompetence rule. Second, he states that Sandra's statement was "self-incriminating." Finally, appellant asserts that Sandra's statement was corroborated by both the state's opening statement in his son's trial, and by the stipulated testimony of John Anthony Methany.[3]

{¶ 23} The state responds that Sandra was not unavailable to testify, and thus, Evid.R. 804(B)(3) does not apply. We agree. At the time that the trial court disallowed Speckman's testimony of Sandra's statement, it had not been established that Sandra was unavailable to testify.

---

[3] During trial, the parties stipulated that Mr. Methany would testify that on March 22, 2011, while driving his car in Logan, Ohio, at approximately 7 p.m., he saw a white Crown Victoria. The parties further stipulated that Methany would testify that the Crown Victoria looked like an old police cruiser; that a blond woman was driving the car; that an unidentified male was in the front seat; and that Inman II was in the backseat.

{¶ 24}  It is true that appellant's trial counsel indicated that if called to the stand to testify, Sandra would invoke spousal privilege/incompetence and her Fifth Amendment right against self-incrimination. Appellant, however, did not attempt to call Sandra as a witness. " 'A showing of unavailability under Evid.R. 804 must be based on testimony of witnesses rather than hearsay not under oath unless unavailability is conceded by the party against whom the statement is being offered.' " *State v. Osman*, 4th Dist. Athens No. 09CA36, 2011-Ohio-4626, ¶ 73, quoting *State v. Keairns*, 9 Ohio St.3d 228, 460 N.E.2d 245 (1984), paragraph three of the syllabus; *see also State v. Platt*, 10th Dist. Franklin No. 03AP-1148, 2005-Ohio-705, ¶ 76 (holding that co-defendant, not called to testify was not "unavailable" for purposes of Evid.R. 804(B)(3), where defense counsel did not call co-defendant to stand because it was anticipated that co-defendant would invoke his Fifth Amendment privilege against self-incrimination). Furthermore, a spouse is not unavailable for purposes of Evid.R. 804, just because the spouse may be incompetent to testify under Evid.R. 601(B). *See State v. Smith*, 9th Dist. Wayne No. 02CA0045, 2003-Ohio-2850, ¶ 10 ("If a spouse is incompetent to testify under Evid.R. 601(B), the spouse is not unavailable under Evid.R. 804(A)(1)." This is especially true, because a testifying spouse can waive incompetence and elect to testify. Evid.R. 601(B)(2).

{¶ 25}  Even if we were to assume, arguendo, that Sandra was unavailable for purposes of Evid.R. 804(B)(3), we would find no fault with the trial court's exclusion of Speckman's testimony. Appellant's proffer of Speckman's testimony indicated that Speckman would testify that Sandra, appellant's co-defendant, had implicated her son, Inman II, as Summer's killer; and that she and appellant were in the front seat of the Crown Victoria when Summer was murdered.

{¶ 26}  Sandra's statement is not a statement against interest, but rather, the statement places blame on her son for the murder. As explained by the Fifth District Court of Appeals:

Evid.R. 804(B)(3) provides for the admission of statements against interest because it is assumed no reasonable person would fabricate self-incriminating remarks. While it may be unlikely a reasonable person would fabricate statements which implicate himself in a crime, it may be likely a reasonable person would fabricate statements neutral to his position and inculpatory of another. This is especially true in the case of a co-defendant, who often has an incentive to fabricate facts which are inculpatory of another. Because the rationale behind the admission of statements against interest does not support the admission of those portions of statement which are neutral to the declarant and/or inculpatory of another, we find such portions are inadmissible under Evid.R. 804(B)(3) and should be redacted prior to the admission of the inculpatory statement.

(Citations omitted.)  *State v. Stapleton*, 5th Dist. Perry No. 97CA62, 1998 WL 666774, *4 (Aug. 31, 1998).  *See also State v. Rafferty*, 2nd Dist. Champaign No. 2012CA15, 2013-Ohio-1585, ¶ 16 (quoting *Stapleton*), and *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 63 (holding that Evid.R. 804(B)(3) requires that the declarant's statement so far subject him to criminal liability that a reasonable person would not make the statement unless true, and that, "[a] reasonable person might easily make a false statement that minimized his involvement in the offense.").

{¶ 27}  In the case at hand, appellant wished to introduce the portion of Sandra's statement that accused their son of killing Summer. That statement, however, was not a statement against Sandra's own penal interest, and thus, it is not admissible under Evid.R. 804(B)(3).

C.      *Admissibility of the State's Opening Remarks in the Trial of Inman II*

{¶ 28} Appellant also wished to introduce the prosecution's statement, made during opening statements of his son's trial, which alleged that Inman II was the person responsible for fastening the zip tie around Summer's neck. Appellant contends that the statement is admissible as a non-hearsay admission of a party opponent under Evid.R. 801(D)(2).

{¶ 29} Despite appellant's arguments, it is well settled that counsel remarks made during opening statements are not evidence. *State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995); *State v. Davis*, 4th Dist. Ross No. 10CA3188, 2011-Ohio-1747, ¶ 31. Rather, opening statements often serve to state the party's theory of the case. *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 24 (8th Dist.).

{¶ 30} We fail to see how remarks that have no evidentiary value at the trial in which they are made, are somehow admissible in the subsequent trial of a co-defendant. Simply put, counsel remarks made during opening statements are not evidence, and thus are inadmissible, whether offered at the trial in which they are made, or at a subsequent trial. Accordingly, the trial court did not error in its refusal to permit appellant to introduce the remarks.

D.      *Prejudice to Appellant*

{¶ 31} Even if the trial court erred in refusing to admit Sandra's statement, or the statement of the prosecutor made during opening statements of Inman II's trial, we fail to see how appellant was prejudiced.

{¶ 32} " 'It is axiomatic that in order for there to be reversible error, there must be prejudice to the appellant.' " *State v. Evans*, 4th Dist. Jackson No. 10CA1, 2012-Ohio-1562, ¶ 43, quoting *State v. Rembert*, 5th Dist. Richland No. 04CA66, 2005-Ohio-4718, ¶ 15.

{¶ 33} Appellant contends that the statements in question are important because they demonstrate: (1) that he was not the principal offender in the murder of Summer; and (2) that he

did not have the specific intent to kill Summer. Appellant, however, ignores the law of complicity.[4]

{¶ 34} R.C. 2903.01, defines aggravated murder, in pertinent part, as follows:[5]

(A) No person shall purposefully[6], and with prior calculation and design, cause the death of another * * *.

(B) No person shall purposefully cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping * * *.

{¶ 35} Under R.C. 2923.03(F), a defendant "may be convicted of [an] offense upon proof that he was complicit in its commission, even though the indictment 'is stated * * * in terms of the principal offense' and does not mention complicity." *State v. Herring*, 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (2002). R.C. 2923.03 defines complicity, in relevant part, as follows:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * *

(2) Aid or abet another in committing the offense; * * *.

{¶ 36} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The defendant's intent may be inferred from the circumstances

---

[4] It should be noted that the trial court instructed the jury on the law of complicity.

[5] Appellant was indicted, tried, and convicted of aggravated murder in violation of R.C. 2903.01(A) and R.C. 2903.01(B).

[6] *See* R.C. 2901.22(A): "A person acts purposefully when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature").

surrounding the crime. *Id*.; *see also State v. Markins*, 4th Dist. Scioto No. 10CA3387, 2013-Ohio-602, ¶ 32. The defendant's " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971); *see also Markins* at ¶ 33.

{¶ 37} Here, appellant asserts that the statements demonstrate that he was not the principal offender, and thus he did not act with the requisite criminal intent required for aggravated murder, i.e., he did not purposefully cause the death of his daughter-in-law.

{¶ 38} To resolve this issue we look to the circumstances surrounding Summer's death and appellant's presence, companionship and conduct before and after Summer's death to determine whether appellant supported, assisted, encouraged, cooperated with, or advised the principal in the aggravated murder of Summer.

{¶ 39} According to the evidence adduced at trial, appellant accompanied his son and his wife to the Century National Bank in Logan, knowing that Summer would be alone, at the bank. At the bank, appellant and his son stun-gunned Summer, and forced her into the backseat of their inescapable vehicle, a vehicle which appellant had purchased just days earlier. While in the vehicle, someone tied three zip ties around Summer's hands, and fastened the fatal zip tie around her neck. After Summer was killed, appellant assisted his co-defendants in placing Summer's body in the septic tank of the Faith Tabernacle Church. Appellant also participated in cleaning the vehicle, removing a spotlight from the vehicle's body, and replacing the vehicle's tires. Finally, appellant participated in creating a false alibi and relating that alibi to law enforcement.

{¶ 40} Considering the testimony at trial, there was ample evidence to support a verdict that appellant was complicit in the killing of Summer and that appellant purposefully, and with prior calculation and design, caused the death of Summer, or, alternatively, that appellant was complicit in purposefully causing Summer's death while committing or attempting to commit kidnapping. Accordingly, any error by the trial court in preventing appellant from introducing the statements was not prejudicial error, requiring reversal, because under the law of complicity it need not be established that appellant was the principal offender.

{¶ 41} We also note that both of appellant's aggravated murder charges included identical death penalty specifications. Such specification being that appellant committed aggravated murder while committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping and appellant was the principal offender; or alternatively, that appellant committed aggravated murder while committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping and that appellant acted with prior calculation and design. In addition to finding appellant guilty on both counts of aggravated murder, the jury also found that the state proved, beyond a reasonable doubt, both alternative specifications attached to each aggravated murder charge. Moreover, the state pursued the prior calculation and design specification during the mitigation phase of the trial; not the principal offender specification. Thus, appellant's argument is also without merit to the extent that he contends the mitigation phase of the trial was unfair because of the trial court's refusal to permit the introduction of the statements.

IV.     Conclusion

{¶ 42}  In sum, the trial court did not abuse its discretion in refusing to allow appellant to introduce, at his trial, the statement of Sandra Inman, and the statement of the prosecution made during opening remarks of Inman II's trial. Moreover, even if we were to assume, arguendo, that the exclusion of the statements was error, such error did not prejudice the appellant. Accordingly, appellant's sole assignment of error is overruled, and the trial court's judgment of conviction and sentence is affirmed.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED.  Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earliest of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to the expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, P.J.: Concurs in Judgment & Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

By:_____
     Marie Hoover, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.