[Cite as *State v. Porter*, 2016-Ohio-1115.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 102257

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**BRIAN E. PORTER**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-586069-A

**BEFORE:** E.T. Gallagher, P.J., Stewart, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** March 17, 2016

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

BY:    Jeffrey Gamso
          Sarah E. Gatti
Assistant Cuyahoga County Public Defenders
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Ryan J. Bokoch
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, P.J.:

{¶1} Defendant-appellant, Brian Porter ("Porter"), appeals from his convictions following a jury trial. He raises seven assignments of error for review:

1. The trial court's instruction on self-defense wrongly required Porter to prove that his fear was caused by the actions of the persons he was charged with assaulting when the evidence shows that the fear was caused by their companion, James Mechling, who was with them at all relevant times and who Porter was defending himself against; in addition, the instruction failed to inform the jury that it should consider self-defense evidence when determining whether the state proved its case beyond a reasonable doubt.

2. The trial court erred when it placed on Porter the burden of proof of self-defense, thereby violating his rights under the Second, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and under Sections 1, 4, and 10 of the Ohio Constitution.

3. The trial court erred when it did not instruct the jury that they could draw an inference that James Mechling's testimony would not have supported the state's case from the facts that he was not the alleged victim of a felonious assault count and was not called as a witness on behalf of the state.

4. The trial court committed error when it did not grant Porter's request for a mistrial when the prosecutor, over objection, was permitted to shift the burden to the defendant by suggesting to the jury that he had the obligation to present evidence that he was factually innocent and the state's obligation to provide proof beyond a reasonable doubt of every element of the offenses charged.

5. The trial court committed error when it refused to charge the jury on the mens rea of recklessness in regard to Count 4, discharge of a firearm on or near a prohibited premises.

6. Porter was denied the effective assistance of counsel when his attorney (1) did not object to the erroneous and prejudicial jury instruction of self-defense that required Porter to prove that his fear was caused by the actions of persons he was charged with assaulting when the evidence shows that the fear was caused by their companion, James Mechling, who was with them at all relevant times and who Porter was defending himself against; (2) did not object to the failure to instruct the jury that they were to consider the evidence of self-defense in determining whether the state had met its burden of proof; and (3) did not object to the failure to instruct the jury that they could draw an adverse inference from the state's not calling James Mechling as a witness.

7. Even if the errors complained of are not, by themselves, sufficiently prejudicial to warrant reversal, their cumulative effect is.

{¶2} After careful review of the record and relevant case law, we affirm Porter's convictions.

## I.   Procedural and Factual History

{¶3} Porter was named in a four-count indictment charging him with three counts of felonious assault in violation of R.C. 2903.11(A)(2), and one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3).   The indictment specified that Porter's felonious assault charges corresponded to the alleged victims, Ase Rollins ("Ase") (Count 1), Richard Mechling ("Richard") (Count 2), and Madeline Santiago ("Madeline") (Count 3).   In addition, each count contained forfeiture and one- and three-year firearm specifications.

{¶4} The matter proceeded to a jury trial where the following relevant evidence was presented.

{¶5} In June 2015, Ase, Madeline, Richard, and James Mechling ("James") went to Andy's Hot Spot, a bar located in Cleveland, Ohio.   Ase testified that he and his friends went to the bar to shoot pool and sing karaoke.   At some point in the evening, Madeline sang a karaoke song in Spanish.   When she was finished, she was approached by an individual, later referred to as "Chino," who stated that she "f***ed up [by being] with a white guy."   Ase, who was dating Madeline, testified that he disregarded Chino's comments to Madeline, but that he and Chino got into an argument several hours later over a game of pool.

{¶6} During last call, Ase learned that James had gotten into an argument with the bartender over James's refusal to throw away a full beer.   However, Ase clarified that he did not witness the argument himself.   Subsequently, Ase, Madeline, James, and Richard left the bar

and got into Ase's vehicle, which was parked in the bar's rear parking lot. Ase testified that Chino and Porter were standing outside when he left the bar. Once seated inside his vehicle, Ase noticed that Chino was walking towards his vehicle. Ase testified that when he got out of his vehicle to confront him, Chino stated that "he just wanted to be friends" and shook Ase's hand. Ase testified that he told Chino to "get away from [him]," and he got back into his vehicle.

{¶7} As Madeline drove Ase's vehicle out of the bar's parking lot, Ase heard gunshots. Following the "second or third shot," Ase turned around and observed Porter firing a gun at his vehicle. The bullets struck the side of the vehicle and shattered the rear driver's side window, but no one was injured. Ase testified that he had no prior interactions with Porter, and that no one in his vehicle threatened Porter or had a gun in their possession that evening.

{¶8} Ase testified that he immediately called 911 and waited for the police to arrive. James and Richard left the car and returned to Andy's Hot Spot. During that time, James went to the rear parking lot and broke Porter's car window with a brick. When James and Richard returned to Ase's vehicle, which was parked down the street, the police asked them to leave the scene due to their level of intoxication.

{¶9} During Ase's direct examination, the prosecutor played a portion of the surveillance video taken from the bar's rear parking lot. The video begins at 1:37:10 a.m.[1] and depicts Porter and Chino standing next to Porter's vehicle. At approximately 1:37:38 a.m. video time, Porter is seen opening the passenger's side door of his vehicle to obtain his firearm. At 1:37:47 a.m. video time, Ase's vehicle enters the video screen and slowly drives past Porter and Chino.

---

[1] Although the video indicates that it was 1:37:10 a.m., the testimony presented at trial established that, for various reasons, the real time was approximately 40 to 50 minutes later than the time depicted on the video. (Tr. 202.)

At approximately 1:37:50 a.m. video time, Porter is seen firing his weapon at Ase's vehicle as it pulls out of the parking lot. Thereafter, the surveillance video captures Porter and Chino "high-fiving" each other before Porter returns his firearm to his vehicle and reenters the bar.

{¶10} Richard testified that he went to Andy's Hot Spot with his brother James and his friends Ase and Madeline. He testified that they played pool and sang karaoke. Although he did not witness the altercation, he learned from his friends that there was an issue with Chino after Madeline sang a karaoke song. Richard also testified that he witnessed James get into an argument with the bartender during last call. Richard explained that James was upset that the bartender was making him pour out his beer when other patrons in the bar were still drinking. With respect to the shooting, Richard testified that he was sitting in the rear passenger's side seat when he heard gunshots and saw the car window break. Richard testified that he did not hear any yelling or talking from anyone inside the vehicle and that James did not have a gun in his possession that evening.

{¶11} After the shooting, Richard returned to the bar and began knocking on the front door. Richard admitted that he returned to the bar because he was upset and wanted to know why someone shot at their vehicle.

{¶12} Madeline testified that she went to Andy's Hot Spot with her boyfriend Ase and his friends, James and Richard, to sing karaoke. She confirmed that Chino made an inappropriate comment to her after she sang karaoke, and that he got into an argument with Ase later that evening over a game of pool.

{¶13} Later that evening, Madeline witnessed Chino shaking Ase's hand in the parking lot. However, she did not know the context of their conversation. As she drove Ase's vehicle out of the parking lot, Madeline "heard big pops and felt the glass shatter on [her] arm."

Madeline testified that she looked back as she drove away and saw Porter and Chino. Madeline testified that she did not see Porter interact with anyone in her group that evening. Further, Madeline testified that James did not have a weapon in his possession and that she did not hear anyone threaten Chino or yell from inside the vehicle as they left the bar.

{¶14} Officer James Zak ("Officer Zak"), of the Cleveland Police Department, responded to Andy's Hot Spot with his partner, Officer Katherine Reddy ("Officer Reddy"). Officer Zak testified that he was flagged down by the victims, who stated that they were shot at by someone at Andy's Hot Spot. Officer Zak testified that he was provided with a description of the shooter and went to the bar for further investigation. Subsequently, Officer Zak retrieved a firearm from inside Porter's vehicle and discovered two spent shell casings on the ground near Porter's vehicle. Officer Zak testified that Porter was found inside the bar, where he was detained and later transported to police headquarters. Officer Reddy testified that Porter appeared intoxicated based on the smell of alcohol and his slurred speech.

{¶15} At the close of the state's case, Porter moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion, and the defense proceeded with its case-in-chief.

{¶16} On behalf of the defense, Nicole Ness ("Nicole") testified that she has been going to Andy's Hot Spot for several years and considers Porter a friend. On the night in question, Nicole learned that one of the individuals from Ase's group "got into a heated debate" with the bartender during last call. According to Nicole, one of the individuals from the group stated that he "was carrying heat." Nicole testified that the group was escorted out of the bar by Porter, Toby Cortez ("Toby"), and Jeff Widmer ("Jeff"). Nicole stated that "there was a lot of screaming and yelling going on" and that she was told to stay inside the bar because "they had a gun." Shortly thereafter, Nicole heard gunshots, but did not witness the shooting.

{¶17} Mortimer Fort ("Mo") testified that he works as a bartender at Andy's Hot Spot and considers Porter a "brother." At closing time on the night in question, Mo sold James a six pack of "beer to go." However, James began drinking one of the beers inside the bar and Mo asked Porter to take the beer away from James so that he could dump it out. Mo testified that James "felt disrespected" and was "really upset [Mo] took [his] beer considering [he] had just opened it." According to Mo, James stated, in the midst of their argument, that he had a gun. In response, Porter stated, "hey, me too but it doesn't have to go that far." Mo testified that he asked James and his friends to leave, and they were escorted out of the bar by Porter and Toby. Subsequently, Mo heard gunshots outside the bar.

{¶18} Mellissa Webber ("Mellissa") testified that she was in the bar on the night in question and witnessed the confrontation between James and Mo when James opened a beer after last call. Mellissa testified that Porter, Jeff, and Toby told James and his friends to leave the bar. As they were being escorted outside, Mellissa heard one of the individuals state that they were "packing." Further, Mellissa stated that she witnessed Jeff open the back door during the confrontation outside and heard someone yell, "shut the door, they have a gun." Mellissa testified that she did not witness the shooting and did not know whether Porter was drinking that night.

{¶19} Jeff testified that he was in the bar on the night in question and also witnessed the argument between James and Mo over an opened beer. Jeff stated that Mo asked him to help escort James and his friends out of the bar. Jeff stated that the group was loud and swearing. According to Jeff, "one of the gentleman made a point to say that he was packing heat, that he had a gun."

{¶20} Jeff testified that he escorted James out of the bar and returned back inside. After a few minutes, however, Jeff became concerned that Porter was still outside. Jeff testified that when he opened the back door to check on Porter, he heard Porter yell, "they have a gun." Jeff testified that he simultaneously looked up and observed the individual sitting in the back seat of Ase's vehicle "holding what looked like a gun." At that moment, Jeff shut the back door and "heard the gunfire." After the car "peeled away," Jeff told everyone in the bar to stay inside while he went to make sure Porter was okay. Jeff stated that Porter was "upset and crying." Shortly thereafter, Jeff heard banging on the front door and "something that sounded like gunshots out in front of the bar." At that time, Jeff called 911.

{¶21} Porter testified on his own behalf. Porter recalled that on the night in question, Mo asked him to "grab a drink" from James. Porter testified that James was "belligerent" and did not want to give up his drink. Porter testified that he attempted to defuse the situation but that the altercation became heated once James and his friends began to argue with Jeff and Toby. During the argument, James stated that he had a gun, and Porter responded, "guns don't stop bullets and personally, if it's up to me, I'd rather not be involved in it altogether." Porter testified that everyone was "still jawing back and forth," but he managed to move James and his friends out the back door. Porter testified that he followed the James group outside because he wanted to move his car to the front of the bar.

{¶22} According to Porter, the James group then began heckling Chino, who was also outside talking on his cell phone. Porter testified that the James group were telling Chino that they were "going to 'F' him up." Porter stated that he told Chino to ignore them, "don't even bother with them, just leave." Subsequently, however, someone from the James group shut the

trunk of Ase's vehicle and stated to Porter, "we're going to f*** you up too." At that time, Porter reached into his vehicle for his gun.

{¶23} Porter testified that he was putting the clip into his gun as Madeline began driving the group's car out of the parking lot. Porter described the shooting as follows:

> I remember they had the music loud. They had music loud and they were — the one in the back, James, was still cursing and they pulled up a little slow and he said "I told you I was going to f*** you up," because he said "I told you I was going to f*** you up" and that's when I saw something in his hand.

> As soon as he said he was going to f*** me up, you know, I went up. You know, went on defense. I was scared from then. I don't know what they pulled out of the back. * * * I felt like I was in danger. * * * Because they threatened me. Not only that, but they also said they were packing.

{¶24} Porter testified that he fully cooperated with the police officer's investigation and told them that he fired his weapon because he feared for his life. During his cross-examination, Porter admitted, as evidenced by the surveillance video, that approximately 12 seconds passed between the time he opened his car door to reach for his weapon and the time he pulled the trigger.

{¶25} At the conclusion of trial, the jury found Porter guilty of all counts and specifications. At sentencing, Porter was sentenced to two years of community control sanctions for the underlying offenses. Additionally, the court ordered Porter to serve three years in prison for each firearm specification. The court merged the firearm specification in Count 3 with the firearm specifications in Counts 1 and 2, which were ordered to run consecutively to each other, for a six year total term of imprisonment.

{¶26} Porter now appeals from his convictions.

## II. Law and Analysis

### A. Self-Defense Instruction

**{¶27}** In his first assignment of error, Porter argues the trial court's instruction on self-defense was erroneous because it did not allow the jury to consider James's conduct. Porter specifically challenges the following instruction on self-defense:

> In deciding whether the defendant has reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, you must put yourselves in the position of the defendant with his characteristics, his knowledge or lack of knowledge and under the circumstances and conditions that surrounded him at that time.

> You must consider the conduct of Ase Rollins and/or Richard Mechling and/or Madeline Santiago and determine if their acts and words caused the defendant reasonably and honestly to believe that he was about to be killed or receive great bodily harm.

**{¶28}** The record reflects that Porter did not object to the above instruction and has forfeited all but plain error on appeal. *State v. Burns*, 8th Dist. Cuyahoga No. 95465, 2011-Ohio-4230, ¶ 9.

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show "an error, i.e., a deviation from a legal rule" that constitutes "an 'obvious' defect in the trial proceedings." However, even if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." The accused is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice — the same deferential standard for reviewing ineffective assistance of counsel claims.

> But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.'"

(Emphasis sic and citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

{¶29} Porter concedes that our review is limited to plain error. However, he contends that, "[he] would have been acquitted of the felonious assault charges" had the trial court permitted the jury to consider "the words and actions of James." We disagree.

{¶30} It is undisputed that James was central to Porter's theory of self-defense. Throughout trial, the defense maintained that James threatened to cause Porter bodily harm and subsequently brandished a firearm from the backseat of Ase's vehicle as the group drove past Porter and Chino. However, for the reasons that follow, we find the trial court did not commit plain error by excluding James from the self-defense instruction to the jury.

{¶31} To establish self-defense, a defendant must prove by a preponderance of the evidence that he (1) was not at fault in creating the situation giving rise to the fight, (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was through the use of force, and (3) did not violate any duty to retreat or avoid the danger. *State v. Hill*, 8th Dist. Cuyahoga No. 98633, 2013-Ohio-578, ¶ 44, citing *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. The elements of self-defense are cumulative, and "'[i]f the defendant fails to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense.'" *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990), quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

{¶32} With respect to Porter's testimony that he believed that he was in imminent danger of death or great bodily harm, we note that the jury was presented with ample testimony that James did not threaten Porter from inside Ase's vehicle, and that he did not have a firearm in his possession that evening. In addition, our review of the surveillance video supports the state's characterization of Porter's acts of preparation in the seconds before the shooting as "calculated."

As depicted on the video, Porter is seen reaching for, and subsequently loading, his gun before Ase's vehicle even enters the video screen. Further, we are unable to ignore Porter's conduct immediately after the shooting, which was described as "celebratory" and included him following Ase's vehicle as it pulled away from the scene and his subsequent acts of "high-fiving" Chino and "fist-bumping" Jeff.

{¶33} Based on the forgoing evidence, we find a jury could reasonably conclude that Porter's use of deadly force was intentional and not made in response to a bona fide belief that he was in imminent danger of death or great bodily harm.

{¶34} Nevertheless, even if we were to determine that Porter proved by a preponderance of the evidence that his use of force was in response to a bona fide belief that he was in imminent danger of death or great bodily harm, we find that Porter has not shown that he did not violate a duty to retreat or avoid danger.

{¶35} In this case, the testimony presented at trial indicated that following a verbal confrontation inside the bar, Porter followed the James group to the parking lot and stood next to his vehicle as he spoke to Chino. As stated, the surveillance video then captured Porter retrieve and load his gun before Ase's vehicle even enters the video screen. In our view, the video footage contradicts Porter's testimony that he only went outside to move his vehicle before the bar closed for the evening. Instead, Porter appeared to be waiting next to his vehicle for the James group to leave the premises, while simultaneously preparing for a confrontation.

{¶36} Furthermore, Porter admitted at trial that approximately 12 seconds lapsed between the time James allegedly threatened him while standing outside Ase's vehicle and the time Porter pulled the trigger. Viewing this admission in conjunction with the video footage, we agree with the state's remarks during closing arguments that 12 seconds was long enough for Porter to

retreat, either by reentering the bar, which was just feet from where he was standing, or by walking away from the situation altogether.

{¶37} Generally,

> courts have found that a defendant is at fault in creating the situation giving rise to the affray or violated a duty to avoid danger or retreat when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful.

See State v. Ellis, 10th Dist. Franklin No. 11AP-939, 2012-Ohio-3586, ¶ 15, citing State v. Hall, 10th Dist. Franklin No. 04AP-17, 2005-Ohio-335, rev'd in part on other grounds in In re Ohio Criminal Sentencing Statutes Cases, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, reconsideration granted in part, State v. Straughn, 110 Ohio St.3d 1413, 2006-Ohio-3306, 850 N.E.2d 73 (self-defense not available when defendant acknowledged that he did not have to pursue the victim in the parking lot to try to "smooth things out" after an initial argument but, rather, could have left the scene and retreated safely); State v. Johnson, 8th Dist. Cuyahoga No. 81814, 2003-Ohio-4180, rev'd on other grounds in State v. Johnson, 104 Ohio St.3d 250, 2004-Ohio-6399, 819 N.E.2d 272 (defendant's actions contributed to the altercation when he decided to drive into a parking lot in the first place after having a verbal argument with others, as he easily could have avoided any danger by not entering the parking lot and continuing to a safer destination; furthermore, because defendant saw the others enter their cars with baseball bats, driving to an empty parking lot militates against a finding that defendant's actions were entirely blameless); State v. Mathews, 3d Dist. Logan No. 8-02-19, 2002-Ohio-6619 (self-defense instruction not proper when defendant willingly walked upstairs to complain about loud music and entered into an argument with the victim; the situation could have been avoided if defendant had either not gone upstairs to the apartment in the first place, or if he would have just left the

hallway and returned to his own apartment); *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415 (self-defense instruction not warranted when the defendant was at fault for creating the situation, because he purposely left the tavern seeking to locate and engage the victim and then followed the victim to the parking lot when he could have left well enough alone); *State v. Sudberry*, 12th Dist. Butler No. CA2000-11-218, 2001 Ohio App. LEXIS 5093 (Nov. 13, 2001) (self-defense not available when defendant admitted that he could have retreated from the situation before he attempted to return to the house where he had previously engaged in an altercation with his uncle; instead, defendant was at fault when he tried to go back to the house to get his identification card); *State v. Cole*, 5th Dist. Delaware No. 98 CAC 01001, 1998 Ohio App. LEXIS 3550 (July 2, 1998) (defendant created a situation leading to violence by accompanying his brother onto the victim's property and by approaching the victim; defendant was in a position of safety and could have left with his brother had he chosen to do so but, instead, chose to confront victim thereby creating the very situation which he claims necessitated the use of force); *State v. Bryant*, 12th Dist. Fayette No. CA89-09-019, 1990 Ohio App. LEXIS 3242 (Aug. 6, 1990) (even if the victim fired his weapon first and defendant believed that he was in imminent danger, defendant failed to demonstrate that he was not at fault in creating the situation giving rise to the shooting when he had threatened the victim with a weapon earlier in the day, and then purposely drove to an area with a weapon, stopped, and waited for the victim; defendant could have avoided the situation by refusing to follow the victim after he drove past defendant's house in the first instance); *State v. Kyle*, 8th Dist. Cuyahoga No. 55353, 1989 Ohio App. LEXIS 1751 (May 11, 1989) (even if the victim was the initial aggressor in the altercation, defendant could have easily avoided the situation by not walking toward an area where he knew

the victim would be in order to confront the victim; defendant decided to create and or escalate the conflict by purposely running into the victim).

{¶38} Applying the foregoing precedent to the factors of this case, we find the jury could reasonably find that Porter did not comply with his duty to retreat or avoid danger where he (1) chose to enter a parking lot where he knew the James group would be, despite knowing that a confrontation might ensue, and (2) chose to remain in the parking lot despite having the ability to retreat after James first caused Porter fear of imminent bodily harm by verbally threatening to "f*** him up."

{¶39} For these reasons, we are unable to conclude that the court's failure to list James in its self-defense instruction rose to the level of plain error. While the instruction was arguably incomplete, Porter has not demonstrated a reasonable probability that the instruction affected the outcome of trial. In our view, even if James was included in the instruction, a finding of self-defense is simply not appropriate under the facts of this case.

{¶40} Additionally, Porter argues the trial court failed to instruct the jury that "all of the evidence, including the evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the state's proof of the elements of the crime." *Martin v. Ohio*, 480 U.S. 228, 234, 107 St.Ct. 1098, 94 L.Ed.2d 267 (1987). Contrary to Porter's position, however, the record reflects that the trial court instructed the jury that it must "carefully consider and compare all the evidence" when determining whether the state proved its case beyond a reasonable doubt. In our view, the court's instruction satisfied the requirements of *Martin* by explicitly requiring the jury to consider all evidence, which would encompass the testimony supporting Porter's theory of defense, as well as the evidence introduced during the state's case-in-chief.

**{¶41}** Accordingly, Porter's first assignment of error is overruled.

### B. Constitutionality of R.C. 2901.05(A)

**{¶42}** In his second assignment of error, Porter argues R.C. 2901.05(A), which requires the defendant to bear the burden of proof when raising a self-defense claim, is unconstitutional.

**{¶43}** Porter concedes that the United States Supreme Court upheld the constitutionality of R.C. 2901.05(A) in *Martin*, 480 U.S. 228 at 233-234, 107 S.Ct. 1098, 94 L.Ed.2d 267. However, Porter claims a different result is now warranted in light of the ruling in *Dist. of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**{¶44}** In *Heller*, the court held that the Second Amendment protects an individual's right to possess a firearm in the home for the purpose of self-defense. *Id*. at 635-636. In doing so, the court recognized that self-defense is a "central component" to the right to bear arms. *Id*. at 599. Thus, Porter argues that placing the burden of proof on a person claiming to act in self-defense runs counter to the purpose of the Second Amendment. We disagree.

**{¶45}** While *Heller* recognizes the right to self-defense, "nothing in *Heller* purports to alter the way the states have defined self-defense." *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 47 (8th Dist.). Further, as an inferior court to the United States Supreme Court, we are bound to follow the *Martin* decision and have no authority to overturn it. *State v. Loyed*, 8th Dist. Cuyahoga No. 83075, 2004-Ohio-3961, ¶ 33. As such, this court has previously rejected the argument that *Heller* requires a different result. *State v. Betliskey*, 8th Dist. Cuyahoga No. 101330, 2015-Ohio-1821; *State v. Hudson*, 8th Dist. Cuyahoga No. 96986, 2012-Ohio-1345.

**{¶46}** Accordingly, Porter's second assignment of error is overruled.

### C. Missing Witness Instruction

**{¶47}** In his third assignment of error, Porter argues the trial court erred when it failed to charge the jury with a "missing witness instruction." According to Porter, the state's failure to produce James as a witness raises the inference that his testimony would have been unfavorable to the prosecution.

**{¶48}** Under Ohio law, a missing witness instruction is appropriate if the following requirements are met: "(1) the witness in question [is] within the particular power of a party to produce, and (2) the testimony of that witness would elucidate the transaction." *State v. Husband*, 10th Dist. Franklin No. 08AP-917, 2009-Ohio-2900, ¶ 11, citing *State v. Melhado*, 10th Dist. Franklin No. 02AP-458, 2003-Ohio-4763, ¶ 51. Further, "[i]f the testimony of the missing witnesses would have been merely cumulative, then the witness would not naturally be produced by the state, and the requested instruction would not be appropriate." *Id*.; *see also Silveous v. Rensch*, 20 Ohio St.2d 82, 253 N.E.2d 758 (1969).

**{¶49}** In this case, Porter failed to request a missing witness instruction and has forfeited all but plain error. Nevertheless, after careful consideration of the record in its entirety, we find no error, plain or otherwise. The record does not contain any indication that James was "within the control of the litigant whose interest would naturally be to produce him." Moreover, because Porter was not charged with the felonious assault of James, we are unable to conclude that his testimony would have elucidated the transaction or that his testimony would not have been merely cumulative to the testimony of Ase, Madeline, and Richard. For these reasons, we find the trial court did not err in failing to issue a missing witness instruction.

**{¶50}** Accordingly, Porter's third assignment of error is overruled.

### D. Motion for Mistrial

{¶51} In his fourth assignment of error, Porter argues the trial court erred by denying counsel's request for a mistrial following the testimony of bar owner, Andy Junak ("Junak").

{¶52} The decision whether to grant or deny a motion for mistrial lies within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 36, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). An "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶53} A mistrial should not be ordered in a criminal case "merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). Rather, the granting of a mistrial is necessary only when "a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶54} In this case, Junak was questioned at length about the steps he took when copying the relevant portions of the surveillance video from the bar's security system. Junak testified that the bar has four security cameras inside the bar, as well as one camera at the bar's front entrance and two cameras at its back entrance. On direct examination, Junak testified that he provided the investigating officers with a copy of the footage taken from the security camera located in the back parking lot, which provided the best angle of the subject shooting. In addition, Junak testified that he provided the investigating officers with a copy of the footage taken from the front entrance, which depicted the bar's patrons coming to and from the bar.

{¶55} On cross-examination, Junak admitted that he did not review the video footage taken from inside the bar. Junak explained that he did not review the footage because he was

not asked to make a copy of the footage taken from inside the bar. Additionally, Junak testified that the footage no longer exists because it has since been taped over.

{¶56} On redirect, the state asked Junak whether anyone, law enforcement or otherwise, asked him to copy the video taken from inside the bar. Junak testified, over defense counsel's objection, that no one asked him to produce the surveillance video from inside the bar but that he would have provided the footage had he been asked.

{¶57} Following Junak's redirect examination, defense counsel requested a mistrial, arguing that the state's line of questioning "effectually shifted the burden of proof by suggesting to the jury that Porter had the obligation to collect and present evidence," i.e., the video footage from inside the bar, "to prove that he was factually innocent." We disagree with defense counsel's characterization of the state's redirect examination.

{¶58} It is axiomatic that in a criminal prosecution, the prosecution bears the burden of proof in demonstrating that the accused is guilty beyond a reasonable doubt. R.C. 2901.05(A). Further, the prosecution may not shift to the accused the burden of proof on an essential element of the crime. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

{¶59} However, after careful review of Junak's testimony in its entirety, we find the trial court correctly determined that Porter was not prejudiced by the state's line of questioning. As noted by the court, the state was merely clarifying on the record that it did not willfully attempt to withhold evidence from defense counsel. The disputed footage was simply not requested by the investigating officers because it was deemed irrelevant to the events occurring in the parking lot, and through no fault of the parties, has since been deleted. Accordingly, we cannot say the state was attempting to shift the burden of proof to Porter. Instead, the record reflects that the state

was merely attempting to rebut defense counsel's insinuations during its cross-examination of Junak.

{¶60} Under these circumstances, the trial court did not abuse its discretion in denying Porter's motion for mistrial. Accordingly, Porter's fourth assignment of error is overruled.

### E. Discharge of a Firearm on or Near a Prohibited Premises

{¶61} In his fifth assignment of error, Porter argues the trial court committed error when it refused to charge the jury on the mens rea of recklessness in regard to Count 4, discharge of a firearm on or near a prohibited premises.

{¶62} Contrary to the arguments set forth by Porter, this court recently stated that "R.C. 2923.162(A)(3) is a statute intended to benefit the public good and thus imposes strict liability." *State v. James,* 8th Dist. Cuyahoga No. 102604, 2015-Ohio-4987, ¶ 33. Thus, because R.C. 2923.162(A)(3) is a strict liability offense, Porter was not entitled to a default jury instruction, pursuant to R.C. 2901.21 on the mens rea of recklessness.

{¶63} Accordingly, Porter's fifth assignment of error is overruled.

### F. Ineffective Assistance of Counsel

{¶64} In his sixth assignment of error, Porter argues he was denied effective assistance of counsel when his attorney (1) did not object to the erroneous and prejudicial jury instruction on self-defense that did not allow the jury to consider the actions of James, (2) did not object to the failure to instruct the jury that they were to consider the evidence of self-defense in determining whether the state met its burden of proof, and (3) did not object to the failure to instruct the jury that they could draw an adverse inference from the state not calling James as a witness.

{¶65} The test for ineffective assistance of counsel requires a defendant to prove "(1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the

defendant." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In reviewing a claim of ineffective assistance of counsel, we examine whether counsel's acts or omissions "were outside the wide range of professionally competent assistance" and "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. To establish the second element, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

{¶66} Based on our resolution of Porter's first and third assignments of error, we are unable to conclude that defense counsel rendered ineffective assistance of counsel by failing to object to the challenged instructions. As this court has stated, "counsel cannot be deemed ineffective merely for failing to raise a meritless objection." *State v. Primus*, 8th Dist. Cuyahoga No. 96191, 2011-Ohio-5497, ¶ 18. Accordingly, Porter's ineffective assistance of counsel claim is without merit.

{¶67} Porter's sixth assignment of error is overruled.

### G.  Cumulative Error

{¶68} In his seventh assignment of error, Porter argues cumulative errors deprived him of a fair trial. We disagree.

{¶69} In *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, the Ohio Supreme Court recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed where the cumulative errors deprive a defendant of

his constitutional right to a fair trial, even if the individual errors may not be cause for reversal. *Id.* Pursuant to our analyses under assignments one through six above, we find that the doctrine of cumulative error is not applicable to this case as we do not find multiple instances of harmless error.

{¶70} Accordingly, Porter's seventh assignment of error is overruled.

{¶71} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
MELODY J. STEWART, J., DISSENTS WITH SEPARATE OPINION

MELODY J. STEWART, J., DISSENTING:

{¶72} In its discussion of Porter's assigned error regarding the ineffective assistance of counsel, the majority determines that due to its resolution of the first and third assigned errors, it follows that any objection trial counsel might have made to the jury, instructions would have been meritless. *See supra* ¶ 61. Contrarily, the majority states in its discussion of the first assignment of error that the jury "instruction was arguably incomplete." *See supra* ¶ 35. Because I disagree with the majority's appraisal of the relative effects a defense objection to the instructions might have had in this case, yet agree that the instructions were incomplete, if not wholly deficient, I dissent.

{¶73} Porter has a viable claim of ineffective assistance of counsel. At trial, defense counsel failed to object to the court's jury instruction which excluded James Mechling as a person whose conduct the jury must consider when deciding whether Porter acted in self-defense when firing his weapon. Bearing in mind that Porter's sole defense rested on the assertion that he was in fear of his life and acting in self-defense because he believed that James threatened him with a gun — it was unreasonable for defense counsel not to object to an instruction that did not allow the jury to consider James's conduct. In actuality, it defies all logic.

{¶74} Furthermore, the majority's prejudice analysis focuses on peripheral facts that neither support nor disprove Porter's assertion that he was in fear of his life at the time he fired the shots, while the majority simultaneously ignores almost all of the evidence presented that would support Porter's self-defense argument. Porter maintained throughout the trial that he was not in fear of his life until James threatened to harm him as the car slowly approached him with James in the opened window of the rear driver's side passenger seat. Porter testified:

> I remember they had the music loud. They had music loud and they were — the
> one guy in the back, James, was still cursing and they pulled up a little slow and

he said "I told you I was going to fuck you up," because he said "I told you I was going to fuck you up" and that's when I saw something in his hand.

As soon as he said he was going to fuck me up, you know, I went up. You know, went on a defense. I was scared from then. I don't know what they pulled out of the back.

* * *

I felt like I was in danger.

(Tr. 435-436.)

**{¶75}** The relevant time frame, therefore, that should be the focus of Porter's claim of self-defense are the moments just before Porter discharged his weapon. Instead of focusing on this time frame, the majority centers its discussion around the period of time when Porter and Chino were at Porter's car and Porter retrieved his weapon, and the minutes following the shooting where the majority unfairly notes Porter's conduct as "celebratory" with "high-fiving" and "fist-bumping."

**{¶76}** First, Porter's actions while at his car are of little importance to the self-defense claim as they at most show that he was preparing to meet potential force with force — a right this country and this state recognizes. *See McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (explaining that the Second Amendment to the United States Constitution protects the right to keep and bear arms for the purpose of self-defense and is fully applicable to the states); *see also* R.C. 2923.12(C)(2) and (D)(2).[2] Second, referencing Porter's actions after the shooting as "celebratory" is an unfortunate adoption by the majority of the state's trial tactic and a mischaracterization of what occurred based on the video (without the benefit of audio) and the testimony.

---

[2] At the time of the shooting Porter had a valid CCW license.

{¶77} The video clearly shows that Chino, not Porter, initiated the high-fives or fist-bumps. Porter testified:

> It was like it was adrenaline in the beginning, and I started walking it off, and then I mean, that Chino guy came up to me, and he's trying to high five me, and I'm just not, you know, it just didn't seem like the appropriate thing.
>
> Finally I just gave in and did it, and then I was — I was, you know, I started crying over it a little bit. I was kind of choked up.

(Tr. 438.)

{¶78} Other testimony at trial established that Porter was upset and crying after the shooting. Indeed, the video shows one of the trial witnesses consoling Porter with a hug that lasted several seconds and later initiating a fist-bump with Porter.

{¶79} Additional evidence relevant to the self-defense time frame that the majority ignores includes testimony that James appeared highly intoxicated and acted belligerently in the immediate time frame leading up to the shooting. Further, the majority ignores video camera footage showing Porter and Chino standing by Porter's car when Porter's attention is drawn to something occurring off-camera. Porter testified that what occurred off-camera was the Mechling gang getting into their car and James making threats to "fuck [him] up." Porter testified that due to those threats he turned to load his gun. Porter further testified that as the car continued to approach and came to a near stop in front of him, James continued his threats and displayed something from the rear passenger side window that Porter thought was a gun. The video lends support to this testimony because it depicts a blurry image (of something unidentifiable) being raised in the rear driver's side window of the vehicle — the location where, by all accounts, James was sitting. Yet, the jury was completely prohibited from considering this evidence based on the jury instructions. Porter testified that it was at this point he was in

fear of his life and reacted defensively by shooting at the car door where James (who interestingly is not a named victim in this case) was seated.

{¶80} The Mechling car drove so slowly as it approached Porter, with James prominently in the back seat window, that a jury could reasonably find that Porter had a legitimate fear for his safety. Viewed subjectively, the video recording shows that Porter took his head out of his car only to see the Mechling car stopping just feet away from him. With everything that Porter had seen and heard from James, he could reasonably believe that James was going to act first. By provocatively stopping their car in front of Porter's car, it is reasonable to conclude that Porter made the split-second decision to protect himself from harm.

{¶81} Moreover, the majority mistakenly concludes that Porter violated his duty to retreat by not going back into the relative safety of the bar when the Mechling group was preparing to leave. Porter was under no duty to retreat at that time. According to Ohio law,

> [d]eadly force may be used as a defense against a danger of death or great bodily harm, but, when deadly force is used, the defendant, in addition to the other requirements for self-defense, must not have violated any duty to retreat in order to protect himself from that danger. To prove that the duty to retreat was not violated when deadly force was used, the defendant must show that no means of retreat or avoidance was available to him and that his only means of escape or avoidance was the deadly force he used.

*State v. Dale,* 2d Dist. Champaign No. 2012 CA 20, 2013-Ohio-2229, ¶ 15.

{¶82} Thus, the duty to retreat does not arise until a defendant is in reasonable and honest fear for his life and acts upon that fear. If in that moment, the defendant can safely remove himself from the encounter then he has a duty to do so. Here the majority simply says, again while not focusing on the relevant time frame, that Porter did not have to stand outside and load his gun but could have gone back into the bar. Porter is clear in his testimony at what point he was in fear for his safety. It was not while he was standing at his car or even when he loaded

his gun. Porter testified that he was in fear of his life when the car slowly approached him and he saw James in the window with, what Porter thought was, a gun pointing at him. At that moment, there was nowhere for Porter to safely retreat. To suggest that Porter had a duty to retreat any sooner would mean that anyone armed for his protection and weary of being attacked (for example a person walking in a dangerous neighborhood) has the duty to remove himself from that place prior to a possible attack simply because he is afraid. The majority's interpretation of the duty to retreat could have the serious consequence of victim blaming. But more importantly, it is not the law of this state.

{¶83} To satisfy the prejudice element of *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 82 L.Ed.2d 674, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*. at 694. A "reasonable probability" is defined as one that is "sufficient to undermine confidence in an outcome." *Id*. There can be no confidence in the verdict of a jury that was wrongfully precluded from considering the one and only defense offered by Porter: that he acted in self-defense based on the actions of James Mechling. Indeed, the only reason why the three individuals who are the subject of the charges against Porter are victims in this case is by virtue of Porter's response to the conduct of James Mechling. None of the other three individuals in the car are alleged to have put Porter in fear of his life. Accordingly, this court should reverse the convictions and remand for a new trial where Porter is afforded an opportunity for the jury to consider James Mechling's conduct when determining whether Porter acted in self-defense.

{¶84} In light of the above discussion, I also find that the failure to instruct the jury on self-defense in reference to count 4 was in error. Following the close of evidence, the court, defense counsel, and the prosecutor engaged in discussions regarding what counts warranted a

self-defense jury instruction.   All parties agreed that Counts 1–3, the felonious assault charges, warranted the instruction.   The state, however, objected to the instruction on count 4: shooting over a roadway.   The state argued that because shooting over a roadway in violation of R.C. 2923.162(A)(3) is, in effect, a strict liability crime, self-defense does not operate as an affirmative defense to the crime.   In support of its argument, the state cited *State v. Patton*, 106 Ohio App.3d 736, 667 N.E.2d 57 (1st Dist.1995), and *State v. Harr*, 81 Ohio App.3d 244, 610 N.E.2d 1049 (9th Dist.1992).   The defense argued that shooting over a roadway was not a strict liability crime, and that even if it was, self-defense would still apply, citing to *State v. Henley*, 138 Ohio App.3d 209, 740 N.E.2d 111 (9th Dist.2000).

{¶85} In *Henley,* the defendant appealed from his convictions for criminal damaging under R.C. 2909.06(A)(1) and for discharging a firearm over a highway under then R.C. 3773.211 (now R.C. 2923.162(A)(3))[3] on the grounds that he should have been allowed to raise the affirmative defense to those charges.   For reasons undisclosed, the trial court declined to instruct on self-defense, ruling that the defense would not apply to those charges.   The Ninth District reversed the convictions and remanded for a new trial.   In doing so, the court stated:

> To hold that an individual cannot act in self-defense for fear of incurring a charge of criminal damaging or another related charge when the action behind the charge is so intertwined with the attack necessitating self-defense would be to produce an inane legal paradox; it would be illogical, for example, to hold that an individual may be innocent of assault or an even more significant charge due to self-defense, but nonetheless guilty of criminal damaging because property was necessarily damaged in the course of doing that which the law allows.

{¶86} The state countered by arguing that the case never addressed whether criminal damaging was a strict liability crime and therefore was inapplicable to the present case.   The

---

[3] R.C. 2923.162(A)(3) states that "[n]o person shall do any of the following: Discharge a firearm upon or over a public road or highway."

state did not comment on the fact that the court found that the self-defense instruction should have also been given on the shooting over a highway charge — which is the same charge in Porter's case.

**{¶87}** Following the discussion, the court declined to rule on whether the crime of shooting over a roadway was a strict liability offense. The court concluded that the facts of the case showed that the Mechling car was pulling away into the road when Porter fired the shots, and therefore Porter was not justified in acting in self-defense because the car was not a threat to him in that moment. The court thus refused to give the self-defense instruction on count 4, but allowed the instruction on Counts 1–3.

**{¶88}** Since Porter's conviction, this court has had the opportunity to decide the issue of whether shooting over a roadway is in fact a strict liability offense. In *James*, 8th Dist. Cuyahoga No. 102604, 2015-Ohio-4987, ¶ 33, we answered the question in the affirmative. With this now confirmed, the trial court's decision raises two issues: 1) is self-defense a defense to the strict liability crime of shooting over a roadway, and 2) do the facts of this case warrant an instruction on self-defense on that charge.

**{¶89}** The state offered two cases in support of its argument that self-defense is not a defense to strict liability crimes, neither of which lend firm support to its argument. In *Patton*, 106 Ohio App.3d 736, 667 N.E.2d 57 — a case in which the state rather disingenuously argued that the court affirmatively held that self-defense does not apply to strict liability crimes — the court actually stated in its opinion that "self-defense may be available to defendants to justify even a strict liability offense." *See id.* at 739 (explaining that courts have held that self-defense can be a defense to having a weapon while under disability — a strict liability crime).

{¶90} Admittedly, the court in *Patton* stated later in its opinion that: "Unless the statute imposes strict liability, self-defense applies any time the [elements of self-defense are present]." The state appears to have relied on this language in support of its argument below, however, it does not necessarily follow from that statement that self-defense will never be a defense to a strict liability crime. On the contrary, the wording of the statement together with the court's previous explanation that in certain cases self-defense may apply to strict-liability crimes, simply means that the court cannot always say whether self-defense will apply to a strict liability crime but that it can say that self-defense will always apply when the elements are met and the crime is not a strict liability crime.

{¶91} Moreover, the state's reliance on *Harr,* 81 Ohio App.3d 244, 610 N.E.2d 1049, is shortsighted and imprudent. The court in *Harr* appears to wholeheartedly support the state's position that self-defense is not a defense to strict liability crimes. The court in that case even offers the explanation on how the defense of self-defense operates: "[t]he affirmative defense of self-defense is applicable to specific intent crimes, in which the defense, once established, negates the purposefulness of the defendant's actions in causing the harm." The court goes on to explain, in so many words, that self-defense does not apply to strict liability crimes because such crimes do not have a mens rea element to negate. *See id.* at 249.

{¶92} *Harr* provides no citation to authority for its explanation. Furthermore, the explanation conflicts with the Ohio Supreme Court's and various other appellate districts' interpretation of self-defense. As the Ohio Supreme Court has noted, self-defense is a defense in which the defendant admits to all of the elements of the crime charged yet asserts that his actions were justified because he was acting in imminent fear of his life (in addition to meeting the other elements of self-defense). *State v. Martin*, 21 Ohio St.3d 91, 488 N.E.2d 166 (1986);

*see also State v. Edgarson*, 8th Dist. Cuyahoga No. 101283, 2015-Ohio-593, ¶ 17 (stating, "self-defense is a justification for admitted conduct"); *State v. Roundtree,* 6th Dist. Lucas No. L-14-1052, 2015-Ohio-2230, ¶ 25 (stating, "[s]elf-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged); *Columbus v. Peoples*, 10th Dist. Franklin No. 05AP-247, 2006-Ohio-1718, ¶ 46;   Thus, according to these cases and many others like them, self-defense is a justification defense, not a defense that negates an element of the crime as *Harr* concludes.

{¶93} It follows then, that because self-defense has been recognized as a defense to the strict liability crime of having a weapon while under disability, it would also be a defense to the crime of shooting over a roadway.   Both crimes are meant to protect the public from harm, yet courts understand — at least in the case of the weapon while under disability charge — that a person has the right to defend himself without incurring criminal charges for the conduct, when self-defense necessitates the would-be criminal conduct.   *See Patton* at 739.   This is precisely what the Ninth District meant in *Henley,* 138 Ohio App.3d 209, 740 N.E.2d 111, when it stated that it would be an inane legal paradox to hold that an person cannot act in self-defense, for fear of being charged with a crime, when the person's actions are so "interwined with the attack necessitating self-defense."

{¶94} Lastly, the court erred in concluding (notwithstanding the strict liability nature of the offense) that the facts in this case did not warrant an instruction on self-defense for the shooting over the roadway charge.   The court concluded that because the car was driving away from the defendant as it proceeded into the roadway, the threat was diminished such that Porter should not have felt in fear of his life.   This analysis is incompatible with the court's decision to give the self-defense instruction on the felonious assault charges.   Porter's discharge of his

weapon was one act. The point in time when Porter fired his gun was the same point in time when the car was moving into the roadway, and it was the same point in time that the felonious assaults would have occurred. Thus, because the court concluded that the self-defense instruction was warranted for the felonious assaults, the instruction was necessarily warranted for the shooting over a roadway. Moreover, the relevant threat was not the car itself, but was James Mechling in the back seat of the car whom Porter believed was armed. It goes without saying that bullets can travel in any direction a gun is pointed even if a car is pulling away. Accordingly, the trial court should have instructed on self-defense for Count 4.